**David L. ALLEN, Appellant–Respondent,**

v.

**Vickie (Wamsley) PROKSCH, Appellee–Petitioner.**

No. 32A05–0412–CV–686.

Court of Appeals of Indiana.

Aug. 17, 2005.

---

William G. Brown, Katherine S. Brown, Brown & Somheil, Brazil, for Appellant.

Katherine A. Harmon, Baxter James & Rose, Indianapolis, for Appellee.

## OPINION

SHARPNACK, Judge.

David L. Allen ("Father") appeals the trial court's order denying his motion to transfer and the trial court's order granting maternal grandmother, Vickie Wamsley Proksch ("Grandmother"), legal and physical custody of Father's son, C.A. Father raises four issues, which we consolidate and restate as:

I. Whether the trial court erred by concluding that Father was estopped from challenging the trial court's jurisdiction over the particular case; and

II. Whether the trial court abused its discretion by granting custody of C.A. to Grandmother.

On cross-appeal, Grandmother raises one issue, which we restate as:

III. Whether the trial court abused its discretion by ordering Grandmother to pay $4,500 of Father's attorney fees.

We affirm in part and reverse in part.

The relevant facts follow. Father and Beth Manion ("Mother") had a child, C.A., who was born on July 1, 1994. Father and Mother were married in August 1994, and their marriage was dissolved in July 1995. Father and Mother's dissolution proceedings were held in Clay County. As part of the dissolution, Father and Mother en-

tered into an agreement regarding custody and support in which they agreed that they would share joint legal custody of C.A. and that Mother would have physical custody of C.A. They also agreed that Father would pay $25.00 per week for child support. On July 5, 1995, the trial court approved the agreement, ordered the parties to comply with the terms of the agreement, and entered a decree of dissolution.

Between 1995 and 1997, Father saw C.A. five to six times. In March 1997, Father filed an information for contempt against Mother and alleged that Mother was in contempt of the trial court's dissolution order because she had "consistently denied [Father] visitation" with C.A. Appellant's Appendix at 43. In September 1999, Father filed another information for contempt against Mother and alleged that Mother had "consistently denied [Father] visitation" with C.A. and that Mother had "moved numerous times since the Dissolution of Marriage and [had] failed to advise [Father] of her whereabouts further hampering his visitation rights." Id. at 45. In December 1999, pursuant to an agreement reached between Father and Mother, the trial court entered an order that required Father and Mother "to exchange addresses and phone numbers in the event of moving or in the event telephone numbers should change, within 24 hours of any such change." Id. at 47. The order also required Mother, who was then living in Indianapolis, to provide transportation for C.A. when he visited Father.

From 1999 to 2001, Father had regular visits with C.A. Father had remarried to Michelle Allen ("Stepmother"), who had two sons ("the stepsons") from a previous marriage. In the summer of 2001, C.A. was at Father's house and was playing outside with the stepsons. Stepmother looked out the window and saw C.A. "humping" the neighbor's dog. Appellant's Appendix at 447. Stepmother went outside and told C.A. to stop because it was disgusting, and C.A. told her that he was just showing the stepsons what Mother does with her boyfriends. The Department of Family Services ("DFS") later came to Father and Stepmother's house because Mother had called and told them that the stepsons were humping C.A. in their bedroom. DFS interviewed the stepsons and dropped the investigation. Thereafter, during a phone conversation with Mother, Father told her that he did not feel that it would be a good idea for C.A. to stay with him during the summer. Stepmother also told Mother that C.A. was not welcome in her home for the summer. After that conversation, Father did not have any contact with C.A. until 2003 when Mother initiated this lawsuit.

In June 2002, Mother left C.A. in Grandmother's care for the weekend, but he ended up staying permanently. Father continued to pay child support, but Mother used the child support payments to pay off her bills. In September 2002, Mother, who was apparently living in Hendricks County at that time, went to the Hendricks County Prosecutor's Title IV–D office and requested that the prosecutor file a request to modify child support. In December 2002, the Hendricks County Prosecutor, pursuant to Ind.Code § 31–16–20–1, filed a petition to transfer the jurisdiction of the child support order from Clay County to Hendricks County. At the time of filing the petition, Mother was living in Hendricks County, Father was living in Putnam County, and C.A. was living in Marion County with Grandmother. The petition was not verified, and Father did not receive notice of the petition. That same month, the Clay County court, without holding a hearing, granted the petition to transfer the case to Hendricks County.

On December 30, 2002, the Hendricks County court entered an order acknowledging the transfer of the case and requiring the parties to file a written response by January 31, 2003. On January 9, 2003, Mother filed a petition to modify child support. On January 28, 2003, Father filed a petition to transfer the case back to Clay County and alleged that he did not have notice of the State's petition to transfer the case to Hendricks County. Contemporaneous with the filing of his petition to transfer, Father filed a petition to modify custody and an information for contempt against Mother for denying Father visitation with C.A. and for not advising him of her address since December 2001.

On March 10, 2003, Grandmother sent a letter to Father telling him that she wanted to meet with him to talk about C.A. and asking him to call her. Father called Grandmother a few days later, but she did not tell Father that C.A. was living with her. On March 19, 2003, Grandmother filed a motion to intervene and a petition to modify custody in which she sought custody of C.A. On April 23, 2003, Mother and Grandmother filed an agreed entry wherein Mother stated that she agreed that it was in the best interests of C.A. if Grandmother was granted custody of him. The agreed entry was not signed by Father and was not approved by the trial court.

On May 28, 2003, Father filed an information for contempt against Grandmother for denying Father visitation with C.A. On May 29, 2003, the trial court held a hearing on Father's petition to transfer and Grandmother's motion to intervene. Father and Grandmother appeared at the hearing, but Mother did not. The trial court entered an order in which it: (1) denied Father's petition to transfer and retained jurisdiction of the case; (2) granted Grandmother's motion to intervene; (3) appointed a guardian ad litem; and (4) gave Father supervised parenting time.

On November 24, 2003, the guardian ad litem filed her final report wherein she recommended that Grandmother be granted custody of C.A. Specifically, the guardian ad litem's report provided:

[C.A.'s] affections and sense of safety are so interwoven in Grandmother and [Grandmother's husband,] Gary, that to sever them would seriously spoil and endanger [C.A.'s] future emotional well-being at this time. To uproot [C.A.] from the first stable environment that he has experienced and to place custody with Father would send [C.A.] back to square one, with his emotional needs being all scrambled (ADHD, ODD, and depression).[1] This would have a long-term effect upon him.

GAL [guardian ad litem] recognizes that the law has a preference for natural parents to have physical custody of their children, but GAL recommends that Grandmother be given the legal and primary physical custody of [C.A.].

Appellant's Appendix at 89–90.

On November 26, 2003, Father filed a motion for a psychiatric evaluation of C.A. On December 4, 2003, Father renewed his petition to transfer jurisdiction to Clay County. That same day, the trial court held a hearing on all pending motions. Prior to the hearing, the trial judge and the guardian ad litem met with C.A. in chambers, and C.A. told the judge that he wanted to stay with Grandmother. During the hearing, the trial court granted Father's motion for a psychiatric evaluation, and Mother dismissed her motion to modi-

---

1. "ADHD" stands for "attention deficit hyperactivity disorder," and "ODD" stands for "op-positional defiant disorder."

fy support. Also during the hearing, the trial court denied Father's renewed petition to transfer but offered to certify it for interlocutory appeal. Father declined the trial court's offer for an interlocutory certification. The trial court later entered an order regarding Father's petition to transfer and concluded that Father was estopped from challenging the trial court's jurisdiction over the particular case.[2] Specifically, the trial court's order provided:

\* \* \* \* \*

On December 27, 2002, this case was transferred in from Clay County Superior Court. Indiana Code [§ ] 31–16–20–3 required this court to accept the transfer.

On December 30, 2002, Hendricks Superior Court 3 ordered the parties to file with the Court a written response of pending motions by January 31, 2003.

On January 28, 2003, Father, by counsel, filed three motions, namely:

1) *Petition to Transfer;*

2) *Petition to Modify;* and

3) *Petition for Contempt.*

In his January 28, 2003, *Petition to Transfer,* and his December 3, 2003 *Renewed Motion to Transfer,* Father objects to this court's jurisdiction over this case—i.e. to venue. Specifically, Father argues that he was not notified and given an opportunity to be heard in Clay County on the State of Indiana's *Petition to Transfer.*

Indiana Code [§ ] 31–16–20–5 requires the *Petition to Transfer* be verified, requires notice be given to the other parent, and a hearing on the petition before an order to transfer is entered.

A review of the file indicates that the *Petition to Transfer* was not verified, Father was not notified and a hearing was not scheduled or held in Clay County.

In order for Hendricks Superior Court 3 to have legal power to enter a valid ruling in this case, the court must have subject matter jurisdiction, personal jurisdiction, and jurisdiction over this particular case or venue. *In Re Chapman* [,] 466 N.E.2d 777 (Ind.Ct.App. 1984).

Indiana Code [§ ] 31–16–20–3 grants this court subject matter jurisdiction, Father has appeared personally and by counsel in this court; therefore, the court has personal jurisdiction. The critical question is whether or not venue is proper in Hendricks County.

The State of Indiana and [Grandmother] argue that Father waived his objection to venue by voluntarily appearing before this court.

Father timely objected to venue and continues to object to venue. Father has not waived his objection to venue.

However, Father did request affirmative relief from Hendricks Superior Court 3 by filing his *Petition to Modify* on January 28, 2003, his *Information for Contempt* on January 28, 2003, his *Information for Contempt* on May 28, 2003, and his *Motion for Psychiatric Evaluation* on November 26, 2003.

A party who seeks affirmative relief from a court may be estopped from challenging the court's jurisdiction. *Kondamuri v. Kondamuri,* 799 N.E.2d 1153

---

**2.** At times, the trial court referred to Father's challenge as a challenge of the trial court's venue. In their appellate briefs, the parties have argued the issue as one of jurisdiction over the particular case. Thus, we will address the issue in the same manner and will refer to it as a challenge of the trial court's

jurisdiction over the particular case. *See Mishler v. County of Elkhart,* 544 N.E.2d 149, 152 (Ind.1989) (noting that Indiana courts sometimes describe questions regarding proper venue as "jurisdiction over the particular case").

(Ind.Ct.App.2003)[, *trans. denied.*], *In Re The Marriage of Hudson and Hudson,* 434 N.E.2d 107 (Ind.Ct.App.1982)[, *cert. denied.* 459 U.S. 1202, 103 S.Ct. 1187, 75 L.Ed.2d 433 (1983) ]; *Kelley v. Kelley,* [180 Ind.App. 19,] 387 N.E.2d 452 [ (1979) ].

In his *Petition to Modify,* Father asks this court to grant him physical custody of [C.A.]. In his *Information for Contempt* filed January 28, 2003, Father asks this court to hold Mother in contempt of her alleged denial of his parenting time with [C.A.]. In his *Information for Contempt* filed [M]ay 28, 2003, Father asks this court to hold Grandmother in contempt of her alleged participation in denial of his parenting time. In his *Motion for Psychiatric Evaluation,* Father requests [C.A.] be evaluated by the psychiatrist of his choice.

Therefore, the Court finds Father is estopped from objecting to this court's venue.

\* \* \* \* \*

Appellant's Appendix at 108–110.

C.A. has twice been hospitalized for suicide attempts: (1) in November 2002; and (2) in April 2003. Around the time of C.A.'s first suicide attempt, Grandmother got C.A. into therapy at Riley Hospital, where he continues to receive therapy. C.A. has been diagnosed with attention deficit hyperactivity disorder ("ADHD"), oppositional defiant disorder ("ODD"), and depression, and he takes medication for his ADHD and depression.

On June 23 and 24, 2004, the trial court held a hearing on both Father and Grandmother's petitions to modify custody.[3] During the hearing, Father testified that after his marriage was dissolved in 1995 until 1997, he saw C.A. five to six times; that from 1997 to 1999, he saw C.A. sporadically because Mother had moved many times; that from 1999 to 2001, he had regular visits with C.A.; and that he had no contact with C.A. after the incident in summer of 2001 when he told Mother that C.A. should not come to his house for the summer until 2003 when Mother initiated this lawsuit. James Rizzo, a social worker with whom C.A. did counseling at Riley Hospital, testified that he did not want to give an opinion regarding custody but that he would not agree with the opinion that C.A. should move in immediately with Father. Rizzo testified that he had concerns about C.A.'s mental health declining if he had an abrupt change in his living conditions and that it would be better to have C.A. ease into a relationship with Father. Rizzo also testified that it was important for C.A. to have a stable environment and that Grandmother had been a stable influence but that Father did not have stability with C.A. The guardian ad litem, who was an attorney, testified that she was aware of the presumption in favor of the natural parent. However, she recommended that Grandmother keep custody of C.A. and that Father increase visitation with C.A. and become involved in his therapy in order to reestablish a bond with the future goal of reunification. Dr. Richard Casserly, the psychologist that Father had evaluate C.A., testified that Grandmother had provided stability to C.A. and "possibly even saved his life[.]" Transcript at 483. Dr. Casserly testified that if C.A. had an abrupt change and Father would gain custody, it would cause "more chaos" for C.A. and "would precipitate more damages." *Id.* at 516. However, Dr. Casserly recommended that C.A. go back to Grandmother's house for "two days for them to tie up their loose ends" and then that Father should have custody of C.A. *Id.* at 532.

Following the hearing, the trial court entered an interim order, which provided

---

**3.** Mother did not appear at the custody hearing.

that Grandmother retain temporary custody of C.A. and that Father have increased unsupervised parenting time with C.A. On November 18, 2004, the trial court entered its order modifying custody, which granted legal and physical custody of C.A. to Grandmother and provided:

\* \* \* \* \*

## FACTS:

1. Mother has one other child, [J.], whom she left with a babysitter for over a week when she first met Father. Mother had chosen to go with Father when he was driving long-distance trucks. After that time, Mother's father, Gary Manion, obtained custody and later adopted [J.]. [J.] was born February 22, 1992.

2. [C.A.] was born July 1, 1994. According to Father, [C.A.] was six months old when he and Mother physically separated. Father testified that [C.A.] has always lived with Mother, but she never provided him stability due to numerous changes in residences and boyfriends.

3. Father's contact with [C.A.] has been sporadic. The parents separated when [C.A.] was approximately six months old. Father saw [C.A.] occasionally. After December 21, 1999, Father began seeing [C.A.] every other weekend until sometime during the late spring or early summer of 2001. [C.A.] was almost 5½ when Father began regularly seeing [C.A.]. Sometime before [C.A.]'s seventh birthday (on July 1, 2001) Father stopped seeing [C.A.] at all. Father did not resume any contact with [C.A.] until this court ordered supervised visitation on May 29, 2003. At that time, [C.A.] was almost nine years old.

4. While this case has been pending, Father had supervised visitation with [C.A.] from May 29, 2003 until June 8, 2004. Since that time, Father has had unsupervised parenting time with [C.A.].

5. Prior to May 29, 2003, [C.A.] had no relationship with his Father. Since that time, Father has tried to establish a relationship with [C.A.] but [C.A.] has resisted.

6. All witnesses testified that [C.A.] is very attached to his Grandmother and that Grandmother must continue to be involved in [C.A.]'s life.

7. [C.A.] is a child with special medical and psychological needs.

8. [C.A.]'s therapist testified that [C.A.] needs a relationship with his Father.

9. According to the GAL report, on [C.A.]'s last visit to Father's home in 200[1,] [C.A.] ... had been "humping" the neighbor's dog earlier that day. Then on Monday after the visitation, Stepmother received a telephone call from Linda Earhardt of the Putnam County Division of Family & Children (hereinafter "DOFC"). Ms. Earhardt came to their home and interviewed Stepmother's [sons]. Father and Stepmother were not allowed in the house during the interviews. Stepmother said it upset the children to have to talk to a stranger. Later that evening, Mother called to ask about summer visitation between [C.A.] and Father. [Stepmother] said that until all the DOFC investigation got straightened out that there would not be any summer visits. [Stepmother] said Mother and her boyfriend at that time, Scott, yelled at Father and called Stepmother a bitch.

10. Father was born May 12, 1961 (age 43). He lives [in] Cloverdale, Putnam County, Indiana[.] He is employed at MKM Distribution, Greencastle, Indiana.

11. Father married Michelle Antria Allen on December 1, 1998. Stepmother was born July 2, 1970 (age 34). Step-

mother has two (2) sons, [C.], born July 19, 1990 and [L.], born July 27, 1992.

12. Stepmother is employed with Rescare. Rescare is a home for juvenile delinquent boys.

13. Father has three (3) other children, Joshua, age 25; Brad, age 22; and Damon, age 19.

14. [C.A.] attends Spring Mill Elementary School. He has an Individualized Educational Plan for behavior issues.

15. The summer of 2002, Grandmother and Gary [Proksch, Grandmother's husband,] enrolled [C.A.] in the enrichment programs at Orchard School (a private school). They enrolled [C.A.] in the public school, Spring Mill, in the fall of 2002 with the consent of Mother. In the summer of 2003, [C.A.] participated in enrichment programs at Park Tudor (a private school). During the 2003–04 school year, [C.A.] participated in math and art enrichment programs and basketball.

16. In May, 2003, Grandmother had to have [C.A.] hospitalized (April 30, 2003 to May 4, 2003) due to a suicide attempt at Methodist Psychiatric Ward. [C.A.] had tried to commit suicide in November, 2002 and that is when he began seeing a counselor at Riley Hospital. He was diagnosed with Attention Deficit Disorder with Hyperactivity (ADHD) and Oppositional Defiant Disorder (ODD). Grandmother and Gary have had to make accommodations within their home to provide security and stability.

17. [C.A.] takes Adderall for his ADHD and Paxil for his depression. He sees Jim Rizzo for therapy and Dr. Karen Walsh for his medication at Riley Children & Adolescent Psychiatry Clinic.

18. Grandmother was born September 27, 1950 (age 54). She lives with her husband, Dr. Gary Proksch, [in] Indianapolis, Indiana[.]

19. [C.A.] has been receiving therapy at Riley Children & Adolescent Psychiatry Clinic since the fall of 2002. He was receiving therapy from Laura Redelman until May 2003. Since that time, he has been seeing Jim Rizzo. [C.A.] has been diagnosed with Attention Deficit Disorder with Hyperactivity (ADHD), Oppositional Defiant Disorder (ODD) and depression. According to Mr. Rizzo, [C.A.] is a child with serious problems that have been going on for quite some time. When Mr. Rizzo started seeing [C.A.] (after supervised visits had started with Father), [C.A.] was out of control. Mr. Rizzo said that [C.A.] has stabilized since that time.

20. [C.A.] has had a rough childhood. He had no stability when he was younger until he began living with his Grandmother and Gary in the summer of 2002. [C.A.] has only had sporadic contact with his Father since 1995 ( [C.A.] would have been only a year old.).

21. Father contends that he did not know where [C.A.] was after the last visitation in 2001. Yet Father did know where Aunt Julie lived and Mother's father lived.

22. Father denied ever telling [C.A.] that he did not want [C.A.] to return to visit Father.

23. [C.A.] deserves stability, routine, and security. He is a special needs child with behavior and emotional issues. To thrive, he needs to be in an environment of stability and security.

24. Mother works and is paid $14.43 per hour. Mother testified that she would have insurance available for [C.A.] after December 27, 2003.

25. Mother admitted that Father's support was current. Mother also admitted that she has not had actual physi-

cal custody of [C.A.] since June of 2002 when Mother left [C.A.] in her mother's care "permanently". Mother admitted that she used the child support for her own personal needs and did not give her mother the money to care for [C.A.].

26. Father has a lot of health problems. He had open heart surgery in 1995 and a stent put in, in June or July, 2003. Father stated he was eligible for disability but he chose not to take it. Father had medical insurance but he incurs approximately $300 a month in medical costs not covered by insurance.

27. Father testified that since the stents were put in, he feels better than he has in 14 years. Father also testified that he did not have any restrictions on his physical activities.

28. Father could obtain health insurance for [C.A.] through Father's employment at an approximate cost of $34 per week. Father earns $12.50 an hour at his job.

29. [C.A.] was about six (6) months old when his parents separated.

30. Substantial evidence was presented that Mother provided [C.A.] with very little stability. Mother moved frequently, lived with several different men and on at least one occasion lived in a women's shelter with [C.A.]. Mother is very self centered and manipulative. Mother did not want Father in [C.A.]'s life. See the GAL report, testimony of Father, Aunt Julie, Gary and Exhibit E, the report of Dr. Richard J. Casserly.

31. Mother did not keep Father advised of where she lived or how to contact her. In 2001, Mother called Putnam County Child Protective Services and reported that [C.A.] was being abused in Father's home.

32. Mother left [C.A.] in Grandmother's care numerous times. At other times, Mother and [C.A.] lived with Grandmother or Aunt Julie. Mother also threatened to take [C.A.] away from Grandmother if Grandmother let Father have contact with [C.A.].

33. [C.A.] is a very intelligent child.

34. [C.A.] has twice been hospitalized for suicide attempts. In November, 2002, and April 30, 2003 to May 4, 2003. [C.A.] takes Adderall, Merlax and Paxil. [C.A.] sees Jim Rizzo for therapy and Dr. Karen Walsh for his medication at Riley Children & Adolescent Psychiatry Clinic.

35. Mr. Rizzo is a clinical social worker licensed in the State of Indiana with thirty years experience. All of his work is with children and adolescents.

36. Mr. Rizzo confirmed that [C.A.] had inpatient treatment for a suicide attempt. Mr. Rizzo testified that suicide attempts are uncommon for children [C.A.]'s age.

37. Mr. Rizzo first met [C.A.] in July 2003. At that time, [C.A.] was very angry, threatening and very alarming. Mr. Rizzo testified that [C.A.]'s behavior has improved but his therapy is not complete.

38. Father had [C.A.] evaluated by Dr. Richard Casserly, a psychologist. Mr. Rizzo testified that [C.A.] was extremely anxious and distraught about meeting Dr. Casserly. Mr. Rizzo testified that he encouraged [C.A.] to cooperate with Dr. Casserly. Dr. Casserly testified that [C.A.] was generally not cooperative during his interview.

39. Mr. Rizzo testified that [C.A.] is of a single mind that he wants to stay with Grandmother and will not open up to consider working on his relationship with Dad.

40. [C.A.] believes that when he was four or five, Father said he never wanted to see [C.A.] again. Father denies he ever said that.

41. Father's contact before this litigation began has been sporadic with periods of little contact and periods of no contact.

42. Mr. Rizzo testified that in his opinion, [C.A.] is very angry with Father and has his heart closed to Father emotionally—i.e. [C.A.] will not choose to let Father in despite Father's efforts to reach out to [C.A.].

43. [C.A.] wants to live with Grandmother.

44. Grandmother is involved in [C.A.]'s treatment and mental health and complies with Mr. Rizzo's requests. Grandmother is also involved in [C.A.]'s school activities and has repeatedly had to go to the school because of [C.A.]'s misbehavior at school.

45. [C.A.]'s therapist and Father's expert, Dr. Casserly both agreed that [C.A.] needed stability and that Grandmother and Gary provided stability.

46. Mr. Rizzo recognized that Father has stability but testified that things were not stable between Father and [C.A.].

47. Mr. Rizzo also testified that [C.A.] is also very angry with Mother and her significant others.

48. Mr. Rizzo testified that [C.A.] needs predictability and consistency.

49. Mr. Rizzo also testified that [C.A.] is a manipulative young man and a master at disruption.

50. Aunt Julie has helped with Father's visitation. She provided the transportation in 2001. She lives ten or fifteen minutes from Father. Aunt Julie lives in the same home and has the same telephone number that she did when Father and Mother separated.

Aunt Julie told Father if he couldn't get in touch with Mother, to contact her and she would get them together. Father did not contact her until supervised visitation was ordered by this court.

51. On May 29, 2003, the court ordered supervised visitation between [C.A.] and Father. Aunt Julie supervised this visitation.

52. Grandmother and Gary have made lots of changes in their lives to accommodate [C.A.]'s needs. They try to never leave him alone.

53. Gary loves [C.A.]. Gary plays with [C.A.], takes [C.A.] to his work, and tries to teach [C.A.] there are consequences for his behavior.

54. Gary testified that [C.A.] learned he had power when he made allegations against Father's stepchildren. On one occasion, [C.A.] threatened Gary "if you are too hard on me, I'll make sex abuse allegations against you".

55. Gary also testified that after [C.A.] visited with his half brother, [J.], [C.A.] accused [J.] of "all kinds of things". Grandmother reported the allegations to Child Protective Services on or about August 21, 2003. Grandmother (nor her counsel) did not report these allegations to [C.A.]'s GAL or Father or this court.

56. Grandmother believes that Mother and Father both abandoned [C.A.].

57. On or about March 10, 2003, Grandmother sent Father a note asking him to call her about [C.A.]. Father called her a few days later. Grandmother did not tell him that she actually had [C.A.] in her care.

58. Grandmother believes that if Father receives custody, she will not ever see [C.A.] again.

59. Stepmother realizes [C.A.] is a special needs child. Stepmother's oldest son has ADHD. Stepmother wants [C.A.] to come and live with them.

60. Stepmother confirmed that Father's contact with [C.A.] has been sporadic. Stepmother first met [C.A.] when he was in diapers and he occasionally visited with Father.

61. Stepmother testified that in the spring or summer of 2001, [C.A.] made allegations that brought Child Protective Services to her home. She testified the boys were playing in the yard and she looked out the window and saw "[C.A.]" humping the dog. She went outside and told him to stop and [C.A.] told her he was showing the other boys what Mom and her boyfriends do. When Putnam County Child Protective Services came out, they were told that Mother reported that the other boys were humping [C.A.]. Stepmother testified that Father and Mother talked on the telephone later that day and Father did say he didn't think it was a good idea for [C.A.] to stay the summer with them. She also admitted that she told Mother that [C.A.] was not welcome in their home for the summer. The telephone conversation was heated and profanity was used. After this incident, [C.A.] did not see Father until this court ordered supervised visitation in May of 2003.

62. After the 2001 CPS incident, Father made very little effort to locate or contact Mother or [C.A.] or Mother's family.

63. On April 13, 2004, Dr. Richard Casserly saw Dad and [C.A.]. Dr. Casserly is a clinical psychologist licensed in Indiana since 1992. The Court finds Dr. Casserly to be well qualified and his testimony very helpful.

64. Dr. Casserly testified that [C.A.] has tested Grandmother and Gary to the max and they have provided stability for [C.A.] and may possibly have even saved [C.A.]'s life.

65. Dr. Casserly testified [C.A.] is caught in the middle and that [C.A.] cannot be "disloyal" to Grandmother.

66. Grandmother testified that if [C.A.] wanted to live with Father, she would agree to it and that she wants [C.A.] to have a relationship with his Father. However, she refused to sign the appropriate form that would allow Dr. Casserly to bill Hoosier Healthwise for his April, 2004 meeting with Father and [C.A.]. Her refusal was vindictive and demonstrates to the court that she will not voluntarily encourage [C.A.] to build a relationship with Father.

Grandmother failed to tell Father in March, 2003 that she actually had [C.A.] in her care at that time and had for approximately nine months.

Grandmother also failed to disclose the August, 2003 CPS investigation concerning [C.A.]'s allegations against his half brother, [J.] to Father, the GAL or the Court.

67. Dr. Casserly testified that [C.A.] should be in treatment for a very long time and that [C.A.] could develop more serious problems if therapy doesn't help.

68. [C.A.] is disrespectful of adults and has actually hit Grandmother.

69. Mr. Rizzo noted that Grandmother was very worried about [C.A.]'s false accusation of sexual abuse against his brother, [J.].

70. After [C.A.] finished first grade in Spring of 2002, he come [sic] to visit Grandmother and Gary for a weekend and [C.A.] just stayed with them.

71. Father's contact with [C.A.] has been sporadic.

72. Father did not have regular visitation with [C.A.] until December 1999. [C.A.] was 5½ years old. Father began visiting [C.A.] on alternating weekends. Father's regular contact with [C.A.] lasted approximately one and a half years. Father's regular visitation ended sometime during the summer of 2001 before [C.A.]'s seventh birthday. Father did not see [C.A.] again until this court ordered supervised visitation in May 2003. Since that time, Father has consistently exercised visitation with [C.A.].

73. On November 24, 2003, the GAL filed her report. Included in the report

were allegations by [C.A.] that Father and Stepmother were mean to [C.A.] and Stepmother whipped him with a braided belt and left bruises on him. The GAL interviewed Stacey Laycock, [C.A.]'s babysitter who confirmed that she took pictures of bruises on [C.A.]'s thighs, legs, ribs and back, and gave them to Mother. Ms. Laycock reported to the GAL that [C.A.] told her he was afraid of Father and that Father whipped him with a belt.

74. [C.A.] has lived with Aunt Julie at times and also spent many weekends in her home. Aunt Julie testified that she observed bruises on [C.A.]'s back and buttocks after he visited with Father (During the period of December 1999 through the summer of 2001).

75. [C.A.] was hospitalized in March 2004 for bowel problems, having fecal incontinence and severe impactions.

### Conclusions of Law

1. Indiana law recognizes the right of natural parents to the custody of their minor children except in rare circumstances.

2. Indiana law presumes that [C.A.]'s best interests will be served by placing custody with Father. The presumption in favor of Father does not shift.

3. To overcome this presumption, Grandmother must present clear and convincing evidence that [C.A.]'s best interests *require* that she be given custody.

4. Indiana law also requires this court to state detailed and specific findings even though the parties did not request them.

5. In 2002, the Indiana Supreme Court decided *In Re Guardianship of B.H. and S.H.*, 770 N.E.2d 283 [ (Ind. 2002), *reh'g denied* ]. In that case the Indiana Supreme Court made it clear that to prevail against a natural parent a nonparent must make an extremely strong case. The Court stated:

"... we hold that, before placing a child in the custody of a person other than the natural parent, a trial court must be satisfied by clear and convincing evidence that the best interest of the child require such a placement. The trial court must be convinced that placement with a person other than the natural parent represents a substantial and significant advantage to the child. The presumption will not be overcome merely because 'a third party could provide the better things in life for the child.' In a proceeding to determine whether to place a child with a person other than the natural parent, evidence establishing the natural parent's unfitness or acquiescence, or demonstrating that a strong emotional bond has formed between the child and the third person, would of course be important, but the trial court is not limited to these criteria. The issue is not merely the 'fault' of the natural parent. Rather, it is whether the important and strong presumption that a child's interests are best served by placement with the natural parent is clearly and convincingly overcome by evidence proving that the child's best interest are substantially and significantly served by placement with another person ... A generalized finding that a placement other than with the natural parent is in a child's best interests, however, will not be adequate to support such determination, and detailed and specific findings are required ..."

6. Indiana Code 31–9–2–35.5 defines "De facto Custodian":

"... a person who has been the primary caregiver for, and financial support of, a child who has resided with the person for at least:

(1) six (6) months if the child is less than three (3) years of age; or (2) one (1) year if the child is at least three (3) years of age. Any period after a child custody proceeding has been commenced may not be included in determining whether the child has resided with the person for the required minimum period. The term does not include a person providing care for a child in a foster family home (as defined in IC 12–7–2–90)"

7. Indiana Code 31–17–2–8 sets forth the parameter a court may consider in a child custody dispute. The Code states:

"The court shall determine custody and enter a custody order in accordance with the best interests of the child. In determining the be[s]t interests of the child, there is no presumption favoring either parent. The court shall consider all relevant factors, including the following:

(1) The age and sex of the child.

(2) The wishes of the child's parent or parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parent or parents;

(B) the child's sibling; and

(C) any other person who may significantly affect the child's best interest.

(5) The child's adjustment to the child's:

(A) Home[;]

(B) School; and

(C) Community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic violence by either parent."

8. Grandmother does not qualify as a defector [sic] custodian because grandmother did not prove that [C.A.] had lived with her for at least one year before Father filed his petition seeking custody.

9. Nevertheless, Ind.Code § 31–7–2–3 grants Grandmother's standing to seek custody of [C.A.]. *In Re The Custody of G.J.*, 796 N.E.2d 756 [ (Ind.Ct.App.2003), *trans. denied* ].

10. Grandmother has overcome the presumption that [C.A.]'s best interests are served by granting custody to father. In 2001, Father abandoned any personal contact with [C.A.] until he sought custody in January, 2003. Before that date, Grandmother and Gary provided [C.A.] with the first real stability he had ever experienced. Grandmother sought appropriate medical care and therapy to help [C.A.] with his many psychological and emotional problems. Grandmother enrolled [C.A.] in school and has been very involved in keeping [C.A.] in school. Grandmother and Gary provided [C.A.]'s financial needs. Although Father has paid support regularly, he was not involved in [C.A.]'s life in any other way.

11. Grandmother has shown by clear and convincing evidence that [C.A.]'s best interests require that Grandmother be granted physical and legal custody of [C.A.].

12. Mother has abandoned [C.A.].

13. All witnesses testified that [C.A.] is very attached to his Grandmother and that Grandmother must continue to be involved in [C.A.]'s life.

**THEREFORE, THE COURT ORDERS THE FOLLOWING:**

1. [Grandmother,] Vickie Wamsley Proksch[,] is granted physical and legal custody of [C.A.].

2. [Father,] David L. Allen[,] shall have parenting time as provided in the Indiana Parenting Time Guidelines for a non-custodial parent.

\* \* \* \* \*

13. Grandmother shall pay her own attorney fees. Within forty-five (45) days, Grandmother shall reimburse Father for the cost of Dr. Casserly's examination and report. Within forty-five days, Grandmother shall pay Father's attorney, William Brown, four thousand five hundred dollars for his attorney fees. Father shall pay any remaining fees owed Mr. Brown.

\* \* \* \* \*

Appellant's Appendix at 17–38.

Father now appeals the trial court's order denying his petition to transfer and the trial court's order granting custody of C.A. to Grandmother.[4]

## I.

The first issue is whether the trial court erred by concluding that Father was estopped from challenging the trial court's jurisdiction over the particular case. Whether a lower court had jurisdiction is a question of law, which we review de novo. *Kondamuri v. Kondamuri,* 799 N.E.2d 1153, 1156 (Ind.Ct.App.2003), *trans. denied.* Jurisdiction is comprised of three elements: (1) jurisdiction of the subject matter; (2) jurisdiction of the person; and (3) jurisdiction of the particular case. *Troxel v. Troxel,* 737 N.E.2d 745, 749 (Ind. 2000), *reh'g denied.* Subject matter jurisdiction refers to the power of courts to hear and decide a class of cases. *Kondamuri,* 799 N.E.2d at 1156. When a court lacks subject matter jurisdiction, its actions are void ab initio and may be challenged at any time. *Id.* On the other hand, jurisdiction over the particular case refers to a trial court's right, authority, and power to hear and decide a specific case within the class of cases over which a court has subject matter jurisdiction. *Id.* A judgment rendered by a court that lacks jurisdiction over the particular case is voidable and requires a timely objection or the lack of jurisdiction over the particular case is waived. *Id.* at 1156–1157. In addition, a party shall be estopped from challenging the court's jurisdiction where the party has voluntarily availed itself or sought the benefits of the court's jurisdiction. *Id.* at 1159. Whether a party should be estopped depends on the facts and circumstances of each case. *Id.*

Here, the Hendricks County Prosecutor, pursuant to Ind.Code § 31–16–20–1,[5] filed

---

**4.** After Father filed his Appellant's Brief with this Court, Grandmother filed a motion to dismiss Father's appeal of the trial court's order denying his petition to transfer because it was not a final judgment, was not an interlocutory appeal of right, and had not been certified as a permissive interlocutory appeal. We denied Grandmother's motion to dismiss and noted that although the trial court's order denying Father's petition to transfer was an interlocutory order, a claimed error in an interlocutory order is not waived for failure to take an interlocutory appeal but may be raised on appeal from a final judgment. We concluded that because Father was appealing from a final judgment, i.e., the trial court's order granting Grandmother custody of C.A., Father was also able to raise the alleged error in the trial court's interlocutory order.

**5.** Ind.Code § 31–16–20–1 provides:

This chapter applies whenever:
(1) there is pending in an Indiana court an order requiring a parent to make regular payments for the support of the parent's children:
(A) subsequent to the dissolution of the marriage of the parents of the children;
(B) as a result of a paternity action under IC 31–14 (or IC 31–6–6.1 before its repeal);

a petition to transfer the jurisdiction of the child support order from Clay County to Hendricks County. At the time of filing the petition, Mother was living in Hendricks County, Father was living in Putnam County, and C.A. was living in Marion County with Grandmother. The petition was not verified, and Father did not receive notice of the petition. That same month, the Clay County court, without holding a hearing, granted the petition to transfer the case to Hendricks County.

Thereafter, the Hendricks County court entered an order acknowledging the transfer of the case and requiring the parties to file a written response by January 31, 2003. On January 28, 2003, Father filed a petition to transfer the case back to Clay County and alleged that he did not have notice of the State's petition to transfer the case to Hendricks County. Contemporaneous with the filing of his petition to transfer, Father filed a petition to modify custody and an information for contempt against Mother. The trial court denied Father's petition to transfer. About six months later, Father filed a motion for a psychiatric evaluation. Father then renewed his petition to transfer, and the trial court denied his petition. The trial court determined that although Father had entered a timely objection to the court's jurisdiction and, therefore, had not waived any jurisdictional argument, he was estopped from challenging the court's jurisdiction because he had sought affirmative

relief from the court. The trial court offered to certify the issue for interlocutory appeal, but Father declined the trial court's offer.

On appeal, Father argues that the Hendricks County court did not have jurisdiction over this particular case because the Clay County court transferred jurisdiction of the case to the Hendricks County court without complying with the statutory requirements. Specifically, Father argues that the petition to transfer was not verified, he did not receive notice of the petition, and no hearing was held regarding the petition prior to the transfer. Grandmother argues that Father was estopped from challenging jurisdiction because Father sought affirmative relief from the court by filing various pleadings in which he sought the trial court's exercise of jurisdiction for his benefit. Father acknowledges his motions seeking relief from the trial court but contends that the fact that he had not had his court ordered parenting time with his son for over one year required him "to take immediate steps so that he could obtain parenting time with his son[.]" Appellant's Brief at 13.

 As noted above, a party shall be estopped from challenging the court's jurisdiction where the party has voluntarily availed itself or sought the benefits of the court's jurisdiction. *Kondamuri*, 799 N.E.2d at 1159. Even if a party timely objects to jurisdiction, it may still be es-

(C) as a result of a legal separation action under IC 31–15–3; or
(D) as a result of a child support action under IC 31–16–2; and
(2) it is shown to the court in which the order is pending that:
(A) the parent or other person rightfully having custody of the children is residing in a different county in Indiana from the county in which the:
(i) dissolution;
(ii) order under IC 31–14 (or IC 31–6–6.1 before its repeal);

(iii) order under IC 31–15–3; or
(iv) order under IC 31–16–2;
was obtained;
(B) the other parent of the children:
(i) no longer resides; or
(ii) is not regularly found;
in the county in which the dissolution, order under IC 31–14 (or IC 31–6–6.1 before its repeal), order under IC 31–15–3, or order under IC 31–16–2 was obtained; and
(C) it would be in the best interests of the children.

topped from raising a jurisdictional challenge "if subsequent actions by the [party] go beyond matters of defense and seek affirmative relief from the court." *Hotmix & Bituminous Equip. Inc. v. Hardrock Equip. Corp.,* 719 N.E.2d 824, 830 (Ind.Ct. App.1999) (citing *State v. Omega Painting, Inc.,* 463 N.E.2d 287, 292 n. 7 (Ind.Ct.App. 1984), *reh'g denied, trans. denied* ). "The rationale behind this application of estoppel is twofold: first, considerations of fairness prevent one from accepting benefits based upon his inconsistent positions; second, the act of accepting benefits is seen as a voluntary consent to the court's jurisdiction." *Jennings v. Jennings,* 531 N.E.2d 1204, 1206 (Ind.Ct.App.1988).

A review of the facts of this case reveal that Father was estopped from challenging the trial court's jurisdiction. This case was initiated after Mother had the case transferred to Hendricks County and filed a petition to modify child support. Father responded by objecting to the transfer and filing a petition to transfer the case back to Clay County. However, at the same time, he sought affirmative relief from the trial court by filing a petition to modify custody and an information for contempt against Mother. The record reveals that after the trial court denied his petition to transfer, Father continued to seek affirmative relief from the trial court. Father filed an information for contempt against Grandmother and then renewed his petition to transfer the case. The record further reveals that Father filed a motion to quash a subpoena and a motion seeking the trial court to order the release of C.A.'s medical records. In addition, after the trial court denied Father's renewed motion, Father denied the trial court's offer to certify the jurisdiction issue for interlocutory appeal. Instead, Father chose to invoke the trial court's jurisdiction by having the trial court make a ruling on his motion for modification of custody.

While we are not unsympathetic to Father's desire to see his son, his actions used to accomplish that desire, i.e., filing various motions with the trial court, constituted acts of seeking affirmative relief from the trial court. Father went beyond the matters of defense and sought the benefit of the trial court's jurisdiction. Therefore, we must conclude that Father was estopped from challenging the trial court's jurisdiction. Accordingly, the trial court did not err by denying Father's petition to transfer. *See, e.g., Hoehn v. Hoehn,* 716 N.E.2d 479, 482–483 (Ind.Ct. App.1999) (holding that the father was estopped from challenging the trial court's jurisdiction because he sought affirmative relief in the trial court after the trial court had denied his jurisdictional objection, which he did not appeal); *Kelley v. Kelley,* 180 Ind.App. 19, 23, 387 N.E.2d 452, 454 (1979) (holding that the father was estopped from challenging jurisdiction because his "submission of the agreed entry for the court's approval was a request for the exercise of jurisdiction by the court"), *reh'g denied.* *See also Williams v. Williams,* 555 N.E.2d 142, 145 (Ind.1990) (holding that the mother had "waived" any challenge to the trial court's jurisdiction over her particular case because of her voluntary conduct in affirmatively engaging the trial court to determine custody and because of her express consent to the trial court's authority to determine custody). *Cf. El v. Beard,* 795 N.E.2d 462, 466 (Ind.Ct.App.2003) (holding that the mother's motion for costs and attorney fees and proposed findings of fact did not constitute requests for affirmative relief and instead were acts to defend against the merits of the action brought against her); *Hotmix,* 719 N.E.2d at 830–831 (holding that a party was not estopped from challenging jurisdiction where the party had filed a compulsory counterclaim contemporaneously with its jurisdictional objection).

## II.

The second issue is whether the trial court abused its discretion by granting custody of C.A. to Grandmother. Ind. Code § 31–17–2–21(a) (2004) governs the modification of a child custody order and provides, in part, that "[t]he court may not modify a child custody order unless: (1) the modification is in the best interests of the child; and (2) there is a substantial change in one (1) or more of the factors that the court may consider under [Ind. Code § 31–17–2–8] .... " When making a determination to modify a child custody order, "the court shall consider the factors listed under [Ind.Code § 31–17–2–8]." Ind.Code § 31–17–2–21(b). Ind.Code § 31–17–2–8 (2004) provides:

The court shall determine custody and enter a custody order in accordance with the best interests of the child. In determining the best interests of the child, there is no presumption favoring either parent. The court shall consider all relevant factors, including the following:

(1) The age and sex of the child.

(2) The wishes of the child's parent or parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parent or parents;

(B) the child's sibling; and

(C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

(A) home;

(B) school; and

(C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 8.5(b) of this chapter.

Father argues that the trial court abused its discretion by modifying custody and granting custody of C.A. to Grandmother over Father. Specifically, Father argues that Grandmother did not present clear and convincing evidence to overcome Father's strong constitutionally protected presumption to have custody of his son.

In disputes between natural parents and third parties, a presumption exists that it is in the best interests of the child to be placed in the custody of the natural parent. *In re Guardianship of R.B.*, 619 N.E.2d 952, 954 (Ind.Ct.App. 1993). "Indiana law has traditionally recognized that 'natural parents are entitled to the custody of their minor children, except when they are unsuitable persons to be entrusted with their care, control, and education.'" *In re Guardianship of B.H.*, 770 N.E.2d 283, 285 (Ind.2002) (quoting *Gilmore v. Kitson*, 165 Ind. 402, 406, 74 N.E. 1083, 1084 (1905)), *reh'g denied.* Child custody determinations fall within the sound discretion of the trial court, and such determinations will not be disturbed on appeal absent an abuse of discretion. *Id.* at 288. We are reluctant to reverse a decision concerning child custody unless the determination is clearly erroneous and contrary to the logic and effect of the evidence. *In re Guardianship of Riley*, 597 N.E.2d 995, 997 (Ind.Ct.App.1992).

The trial court entered findings of fact and conclusions thereon when it issued its order modifying custody. "In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment." *B.H.*, 770 N.E.2d at 287 (internal quota-

tions and citations omitted). We will not reweigh the evidence and will consider only the evidence favorable to the trial court's judgment. *Id.* at 288. A challenger to a trial court's order regarding custody "thus labors under a heavy burden and must show that the trial court's findings are clearly erroneous." *Id.* Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. *Yanoff v. Muncy,* 688 N.E.2d 1259, 1262 (Ind.1997). A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. *Id.* In order to determine that a finding or conclusion is clearly erroneous, our review of the evidence must leave us with the firm conviction that a mistake has been made. *Id.*

▮▮▮▮ Recently, in *B.H.,* our supreme court articulated the following rule with respect to the standard to be applied in custody disputes between a natural parent and a third party:

Despite the differences among Indiana's appellate court decisions confronting child placement disputes between natural parents and other persons,[6] most of the cases generally recognize the important and strong presumption that the child's best interests are ordinarily served by placement in the custody of the natural parent. This presumption does provide a measure of protection for the rights of the natural parent, but, more importantly, it embodies innumerable social, psychological, cultural, and biological considerations that significantly benefit the child and serve the child's best interests. To resolve the dispute in the caselaw regarding the nature and quantum of evidence required to overcome this presumption, *we hold that, before placing a child in the custody of a person other than the natural parent, a trial court must be satisfied by clear and convincing evidence that the best interests of the child require such a placement. The trial court must be convinced that placement with a person other than the natural parent represents a substantial and significant advantage*

6. In *B.H.,* our supreme court discussed cases from its court and our court that "reflect a variation in the relative consideration given to the rights of the natural parent." *B.H.,* 770 N.E.2d at 285–287. Our supreme court engaged in a detailed comparison of our opinions issued in *Hendrickson v. Binkley,* 161 Ind.App. 388, 316 N.E.2d 376 (1974), *cert. denied,* 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 98 (1975), and *Turpen v. Turpen,* 537 N.E.2d 537 (Ind.Ct.App.1989). In *Hendrickson,* we held that when determining a custody issue between a natural parent and a third party, a trial court should use the following "three step approach[:]"

First, it is presumed it will be in the best interests of the child to be placed in the custody of the natural parent. Secondly, to rebut this presumption it must be shown by the attacking party that there is, (a) unfitness, (b) long acquiescence, or (c) voluntary relinquishment such that the affections of the child and third party have become so interwoven that to sever them would seriously mar and endanger the future happi-

ness of the child. The third step is that upon a showing of one of these above three factors, then it will be in the best interests of the child to be placed with the third party.

*Hendrickson,* 161 Ind.App. at 393–394, 316 N.E.2d at 380. In *Turpen,* we rejected the *Hendrickson* methodology "to the extent that [it] suggest[s] to litigants that the trial court must employ a mechanical approach in evaluating the evidence before it." *Turpen,* 537 N.E.2d at 539 n. 2. Instead, we held that a determination of custody between a natural parent and third party involves the question of "whether there is any evidence in favor of the trial court's determination that the presumption the interest of the child would best be served by placing him in the custody of the natural [parent] had been sufficiently rebutted by the evidence." *Id.* at 539. Our supreme court concluded that our *Turpen* approach was "inadequate[,]" and also held that a trial court was not limited to the criteria described in *Hendrickson. B.H.,* 770 N.E.2d at 287.

*to the child.* The presumption will not be overcome merely because "a third party could provide the better things in life for the child." *Hendrickson* [*v. Binkley* ], 161 Ind.App. [388,] 396, 316 N.E.2d [376,] 381 [ (1974), *cert. denied,* 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 98 (1975) ]. In a proceeding to determine whether to place a child with a person other than the natural parent, *evidence establishing the natural parent's unfitness or acquiescence, or demonstrating that a strong emotional bond has formed between the child and the third person, would of course be important, but the trial court is not limited to these criteria. The issue is not merely the "fault" of the natural parent. Rather, it is whether the important and strong presumption that a child's interests are best served by placement with the natural parent is clearly and convincingly overcome by evidence proving that the child's best interests are substantially and significantly served by placement with another person.* This determination falls within the sound discretion of our trial courts, and their judgments must be afforded deferential review. A generalized finding that a placement other than with the natural parent is in a child's best interests, however, will not be adequate to support such determination, and detailed and specific findings are required. [*In re Marriage of* ] *Huber,* 723 N.E.2d [973,] 976 [ (Ind.Ct.App. 2000) ].

*B.H.,* 770 N.E.2d at 287 (emphasis added).

We further note that upon review of a judgment requiring proof by clear and convincing evidence, appellate courts may not impose their views as to whether the evidence is clear and convincing "but must determine, by considering only the probative evidence and reasonable inferences supporting the judgment and without weighing the evidence or assessing witness credibility, whether a reasonable trier of fact could conclude that the judgment was established by clear and convincing evidence." *In re Paternity of V.M.,* 790 N.E.2d 1005, 1007 (Ind.Ct.App.2003) (quoting *B.H.,* 770 N.E.2d at 288).

Applying this rule to the present case, it is presumed that it was in the best interest of C.A. to be placed in the custody of Father, and Grandmother had the burden to overcome that presumption. Here, the trial court concluded that Grandmother had overcome the presumption that C.A.'s best interests would be served by placement with Father and concluded that staying with the Grandmother was in C.A.'s best interests.

Father argues that the trial court's findings were clearly erroneous because there was no finding that Father was unfit, that he had abandoned C.A., or that he had voluntarily relinquished custody of C.A. to Grandmother. However, the trial court is not limited to such factors. *See supra* note 6 (discussing *Hendrickson* factors). Instead, the issue is "whether the important and strong presumption that a child's interests are best served by placement with the natural parent is clearly and convincingly overcome by evidence proving that the child's best interests are substantially and significantly served by placement with another person." *B.H.,* 770 N.E.2d at 287.

The trial court's findings and conclusions indicate that it relied on various factors in determining that Grandmother should be granted custody of C.A.: Father's "sporadic" contact with C.A. from the time of the marriage dissolution when C.A. was less than one year old until the time when C.A. was approximately five years old; Father's act of telling Mother that C.A. should not stay with him during the summer of 2001; Father's "abandon[ment of] any personal contact" with C.A. in the summer of 2001 until 2003, when Mother petitioned the

trial court to modify child support; Father's minimal effort to contact Mother or C.A.; allegations that Father had hit C.A. when C.A. had stayed with him prior to 2001; C.A.'s special behavioral and emotional needs and his need to be in a stable environment; Grandmother's ability to provide C.A. with stability and her involvement with C.A.'s mental health treatment and school activities; and C.A.'s attachment to Grandmother and his desire to remain with Grandmother. Furthermore, the guardian ad litem recommended that, despite the presumption in favor of the natural parent, custody of C.A. should remain with Grandmother with a future goal of reunification with Father. James Rizzo, C.A.'s therapist from Riley Hospital, testified he had concerns about C.A.'s mental health declining if he had an abrupt change in his living conditions and that it would be better to have C.A. ease into a relationship with Father. Rizzo also testified that it was important for C.A. to have a stable environment and that Grandmother had been a stable influence but that Father did not have stability with C.A. In addition, despite his recommendation that Father should have custody, the psychologist hired by Father testified that Grandmother had provided stability to C.A., had "possibly even saved his life[,]" and that an abrupt change of custody of C.A. from Grandmother to Father would cause "more

chaos" for C.A. and "would precipitate more damages." Transcript at 483, 516.

█ The trial court's findings provide ample support for its judgment in granting Grandmother custody of C.A. The trial court referred to the standard of review contained our supreme court's holding in *B.H.* that "before placing a child in the custody of a person other than the natural parent, a trial court must be satisfied by clear and convincing evidence that the best interest of the child require such a placement." Appellant's Appendix at 34 (quoting *B.H.,* 770 N.E.2d at 287). The trial court indicated that Grandmother had provided "clear and convincing evidence that [C.A.'s] interests require[d] that Grandmother be granted physical and legal custody of [C.A.]." Appellant's Appendix at 52. Thus, the trial court was clearly convinced that placement with Grandmother represented a substantial and significant advantage to C.A. According the trial court proper deference, as we must, we decline to conclude that its findings are clearly erroneous or that its judgment is against the logic and effect of the evidence.[7] *See, e.g., B.H.,* 770 N.E.2d at 288 (affirming the trial court's award of permanent guardianship to a third party); *In re V.M.,* 790 N.E.2d at 1009 (affirming the trial court's order that the presumption in favor of the father having custody was rebutted by the grandparent and that the children's best

---

**7.** Father also argues that the trial court abused its discretion by awarding custody of C.A. to Grandmother because "she acted improperly and with unclean hands." Appellant's Brief at 23. Father contends that Grandmother should not have been awarded custody because she hampered Father's ability to see his son and establish a relationship with him. Father appears to argue that Grandmother should be punished for her alleged misconduct by not getting custody of C.A. and cites to *Owensby v. Lepper,* 666 N.E.2d 1251 (Ind.Ct.App.1996), *reh'g denied,* and *In re Marriage of Ferguson,* 519 N.E.2d

735 (Ind.Ct.App.1988), in support of his argument. However, in both *Owensby* and *Ferguson,* we held that a trial court may not issue or change a custody order for the purpose of punishing a parent and that it is the child's welfare, not the parents', that controls the actions of the trial court. *Owensby,* 666 N.E.2d at 1256; *Ferguson,* 519 N.E.2d at 736. Furthermore, the trial court addressed the alleged shortcomings of Grandmother in its findings and conclusions; yet it still determined that she had overcome Father's presumption and that it was in the best interest of C.A. to remain in her custody.

interests were served by continued placement with the grandparent). *See also Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002) (holding that we must "grant[ ] latitude and deference to our trial judges in family law matters" because "we are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence, or that he should have found its preponderance or the inferences therefrom to be different from what he did").

### III.

 The last issue, raised by Grandmother on cross appeal, is whether the trial court abused its discretion by ordering Grandmother to pay $4,500 of Father's attorney fees. The decision to award attorney's fees and the amount of the award are reviewed for an abuse of discretion. *Mitchell v. Mitchell*, 695 N.E.2d 920, 924 (Ind.1998). An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Selke v. Selke*, 600 N.E.2d 100, 102 (Ind.1992). Indiana follows the American Rule, which ordinarily requires each party to pay his own attorney's fees. *Swartz v. Swartz*, 720 N.E.2d 1219, 1223 (Ind.Ct.App.1999). Generally, attorney's fees are not recoverable from the opposing party as costs, damages, or otherwise, in the absence of an agreement between the parties, statutory authority, or rule to the contrary. *Id.*

 Ind.Code § 31–17–7–1(a) provides that a trial court "periodically may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending [a custody proceeding] and for attorney's fees ...." When determining whether or not to award attorney

fees, a trial court "must consider the resources of the parties, their economic condition, the ability of the parties to engage in gainful employment and to earn adequate income, and such other factors as bear on the reasonableness of the award." *Bertholet v. Bertholet*, 725 N.E.2d 487, 501 (Ind.Ct.App.2000) (quoting *Barnett v. Barnett*, 447 N.E.2d 1172, 1176 (Ind.Ct.App. 1983)). Misconduct that directly results in additional litigation expenses may properly be taken into account in the trial court's decision to award attorney fees. *Id.*

Grandmother argues that the trial court abused its discretion in ordering her to pay $4,500 of Father's attorney fees because the trial court did not consider the resources of the parties or the ability of the parties to pay attorney fees and did not set forth any basis for the award of fees. Father argues that the trial court properly ordered Grandmother to pay some of his attorney fees because Grandmother engaged in misconduct that resulted in him incurring litigation expenses.

We find *Bertholet v. Bertholet*, 725 N.E.2d 487 (Ind.Ct.App.2000), to be instructive. In *Bertholet*, a husband appealed a trial court's order in which it sua sponte ordered the husband to pay his wife's appellate attorney fees following an appeal bond hearing, and we reversed the trial court's order of attorney fees. *Id.* at 501. We held that when assessing attorney fees, the trial court "must consider the resources of the parties, their economic condition, the ability of the parties to engage in gainful employment and to earn adequate income, and such other factors as bear on the reasonableness of the award" and that the trial court's failure to hold an evidentiary hearing to consider these issues constituted an abuse of discretion. *Id.*

Here, the trial court sua sponte ordered Grandmother to pay $4,500 of Father's

attorney fees. During the custody hearing, Father testified that he made $12.50 per hour and had spent over $8,000 in attorney fees, while Grandmother testified that she worked part-time in her husband's business and cleaned houses for elderly people on a volunteer basis. The trial court did not hold an evidentiary hearing on the attorney fee issue, and there is no indication that it considered the parties' resources, economic condition, or other factors that would bear on the reasonableness of the award of attorney fees. In failing to hold an evidentiary hearing in order to consider these issues, the trial court abused its discretion. *See, e.g., id.; Barnett,* 447 N.E.2d at 1176 (holding that the trial court abused its discretion in awarding appellate attorney fees to wife where trial court failed to conduct evidentiary hearing and where there was no indication that it considered the economic circumstances of the parties, despite evidence before the court from prior dissolution action that wife was unemployed and without assets and husband was employed with substantial assets). Accordingly, we reverse the trial court's order of attorney fees.

For the foregoing reasons, we affirm the trial court's order granting custody of C.A. to Grandmother and reverse the trial court's order requiring Grandmother to pay $4,500 of Father's attorney fees.

Affirmed in part and reversed in part.

MAY, J., and VAIDIK, J., concur.