# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**JEFFREY A. GOLDING**
Valparaiso, Indiana

ATTORNEY FOR APPELLEES:

**STEVEN M. BUSH**
Valparaiso, Indiana

**FILED**

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE: THE PATERNITY OF A.S. | ) | |
| | ) | |
| M.S., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | No. 64A03-1204-JP-171 |
| | ) | |
| M.S., | ) | |
| and | ) | |
| B.H., | ) | |
| | ) | |
| Appellees. | ) | |

APPEAL FROM THE PORTER CIRCUIT COURT
The Honorable Mary R. Harper, Judge
Cause Nos: 64C01-1002-JP-187, 64C01-1002-MI-1654, and 64C01-1004-MI-3494

**January 31, 2013**

**OPINION – FOR PUBLICATION**

**PYLE, Judge**

M.S. ("Mother") appeals the trial court's order awarding custody of her daughter, A.S., to the maternal grandmother, M.D ("Grandmother").

We reverse.

ISSUE

Whether Grandmother rebutted the presumption that A.S.'s interests are best served by placement with Mother.

FACTS AND PROCEDURAL HISTORY

On February 19, 2002, Mother gave birth to A.S. After their release from the hospital, both Mother and A.S. moved into Grandmother's Crown Point, Indiana home. For an unspecified period, Grandmother provided primary care to both Mother, who was suffering from postpartum depression, and A.S. According to Grandmother, once Mother felt better, "we [Mother and Grandmother] jointly cared and raised [A.S.]" (Tr. 78). Grandmother provided the majority of A.S.'s financial support. Mother sporadically worked outside the home, and Grandmother worked full time as a nurse at a local hospital.

Mother and A.S. continued to live with Grandmother until April of 2007, when Mother moved out of the house to live with her current husband and A.S.'s step-father, Mi.S. ("Stepfather"). In approximately May of 2007, Mother and Stepfather began living in an apartment in Lowell, Indiana. In August of 2007, Mother was convicted of operating a vehicle while intoxicated, and her driver's license was suspended. At that

2

time, Mother had already registered A.S. for pre-school in the Crown Point District, and Mother, Stepfather, and Grandmother agreed that A.S. would continue to live with Grandmother during the school week and live with Mother and Stepfather on weekends. This arrangement continued until May, 2008, the end of the 2007/2008 school year.

After May of 2008, A.S. lived with Mother and Stepfather in their Valparaiso apartment and was living with them at the time of the custody hearing. From May of 2008 until December of 2009, A.S. visited Grandmother on the weekends. On April 22, 2009, Mother gave birth to Mother and Stepfather's first child, Av.S. In July of 2009, Mother again became pregnant, and in December of 2009, Mother experienced life-threatening complications that required her to be hospitalized on December 26, 2009, in an Illinois hospital.

On that date, A.S. was already visiting Grandmother. At Stepfather's request, Grandmother agreed to babysit Av.S. while he visited Mother in the hospital. On December 28, 2009, Grandmother called Stepfather and told him to pick up Av.S., who was crying uncontrollably. Stepfather arrived at Grandmother's house on December 29, 2009, with the intention of picking up both A.S. and Av.S. Stepfather and Grandmother disagreed about whether Mother had authorized him to pick up A.S., and he left Grandmother's house without A.S. Subsequently, Stepfather pushed Grandmother during a confrontation at the hospital.

On January 1, 2010, Mother picked up A.S. from Grandmother's house, and A.S. resumed living with Mother and Stepfather, as she had prior to Mother's hospitalization.

3

Because of the tension between the families, Mother refused contact with Grandmother, and Grandmother did not see A.S. again until January of 2011.

On January 5, 2010, Stepfather filed a petition to adopt A.S. On the same date, Stepfather filed a petition for temporary custody alleging that Mother was being treated for an unspecified medical condition and could not care for A.S. on a full-time basis. The trial court granted the petition for temporary custody on the basis that "placing the child with the petitioner for adoption pending the hearing on the petition for adoption is in the best interests of the child." (Ex. Book 139).

Sometime thereafter, Mother's sister contacted A.S.'s biological father, B.H. ("Father"), on Facebook and informed him that he had a nine-year-old daughter who was about to be adopted by her stepfather. Father is an Illinois resident who knew that he had impregnated Mother but assumed she had lost the child due to complications during the pregnancy. During the years following A.S.'s birth, Father made only one attempt to ascertain whether Mother had given birth, and Mother and Grandmother made no attempt to inform him of the birth. On February 11, 2010, Father filed his "Objection to Petition for Adoption of Minor Child" and a petition to establish paternity.

Meanwhile, on February 5, 2010, Grandmother filed a petition for grandparent's visitation rights. On April 6, 2010, Grandmother followed the filing of the petition for visitation with a petition for custody based on her status as a de facto custodian.

The trial court joined the causes and ordered mediation, and the parties entered into a facilitation agreement on November 18, 2010. The trial court issued a December 6,

4

2010 order incorporating the facilitation agreement, finding in pertinent part that (1) Father was A.S.'s biological father; (2) Stepfather had withdrawn his request for adoption and custody; (3) Mother was the custodial parent; and (4) Father was to begin supervised visitation with A.S. In the order, the trial court reserved other matters for future adjudication.

In a separate order, however, the trial court stated that Grandmother could exercise visitation under the supervision of Family House. This supervised visitation began on January 2, 2011 and lasted for four sessions. Grandmother then began exercising unsupervised visitation with A.S. every other Saturday from 8 a.m. until 8 p.m., an arrangement that was in effect at the time of the custody hearing.

The trial court appointed Mark Roscoe to serve as guardian ad litem for A.S. The guardian ad litem reviewed A.S.'s school progress reports and Mother's medical records, met with Mother, Stepfather, A.S., Grandmother, and Father, and then submitted a report in which he stated:

> [Grandmother] disapproves of the way her daughter has chosen to live her life and contends that she is incapable of caring for [A.S.] in the same manner that [Grandmother] has provided for said child in the past. Although [A.S.'s stepsisters, Av.S. and Al.S.] are also the biological grandchildren of [Grandmother], she has not expressed the same concerns regarding the care of said children. It is evident to this writer that [Grandmother] has developed a maternal bond with her granddaughter, [A.S.], and views her as her own child. As the perceived primary care giver of said child from [A.S.'s] date of birth through 2007, it is not unusual for a grandparent to develop such a bond. However, what concerns this writer is the extent to which [Grandmother] has gone to discredit her daughter and prove that she is incompetent to care for [A.S.], even to the extent of further

5

damaging [Mother's] mental health. This process may impede the reconciliation efforts of all parties involved.

\* \* \* \*

My client, [A.S.], is nine (9) years of age and currently resides with her Mother, Stepfather and two (2) siblings. [A.S.] is a third grade student . . . [and] her favorite subject is Art. She is an above average student and typically earns A's and B's on her report cards. [A.S.] enjoys painting, baking, swimming, playing with her two (2) cats, Penelope and Henry, and playing outside with her friends. She also enjoys spending time with her Mother, Stepfather, and sisters. Although she was sad when she was physically separated from her Grandmother, she reports she has made the adjustment but still misses her. [A.S.] is articulate, direct and a respectful young girl.

\* \* \* \*

[T]here is no doubt in my mind that [Grandmother] has played a major role in providing care and support for [A.S.] throughout the majority of her life, but [Mother] and [Father] are the biological parents of [A.S.] and should be charged with the responsibility of providing care and support for said child. Although [Mother's] progress has been slow with respect to the treatment of her Schizoaffective Disorder, she is maintaining said condition through her medications and has the current ability to recognize when her medications require adjustments. It is unclear to me why [Grandmother] believes that [Mother] is incapable of raising [A.S.] but yet capable of raising [Grandmother's] two other grandchildren, Av.S. and Al.S. I suspect that [Grandmother] is of the belief that [Stepfather], as the biological father of Av.S. and Al.S., is capable of providing care for said children if [Mother] falls short of her responsibility. However, as the Court is aware, this action began with an adoption petition filed by [Stepfather] wherein he was seeking to adopt [A.S.].

(Mother's App. 71; 74).

The guardian ad litem, recommended that (1) Mother retain custody of A.S.; (2) Grandmother be granted visitation; and (3) Father initially be granted supervised

6

visitation with the goal that he eventually be afforded visitation under the Indiana Parenting Time Guidelines. (Mother's App. 75-76).

On October 11, 2011, the trial court held a custody hearing to determine whether Mother, Father, or Grandmother should exercise physical custody of A.S. At the hearing, Grandmother and Father were represented by counsel who presented evidence of Mother's battle with a schizoaffective disorder, former alcoholism, and an early post-adolescent involvement with gangs. Mother appeared pro se, and although she asked no questions of opposing witnesses, she gave a statement to counteract some of the claims made by other witnesses. The guardian ad litem's report was placed into evidence, and the guardian ad litem testified that physical custody should remain with Mother. Grandmother requested that the trial court issue findings pursuant to Indiana Trial Rule 52, and Grandmother and Father filed joint proposed findings on November 10, 2011.

On November 15, 2011, the trial court issued its findings of fact and conclusions of law. The trial court awarded physical custody of A.S. to Grandmother, with Mother and Father to exercise visitation rights. The trial court stated that its ultimate goal was to facilitate a relationship between Father and A.S. that would culminate in Father receiving primary physical custody of his daughter. [1]

On December 15, 2011, Mother filed her "Motion to Correct Error and Motion for Rehearing." (Mother's App. 82). The trial court denied the motion.

---

[1] Mother points out that the trial court's findings and conclusions "mirror[]" the proposed findings. Although we "by no means encourage" the wholesale adoption of proposed findings and conclusions, the practice is not prohibited. *Piles v. Gosman*, 851 N.E.2d 1009, 1012 (Ind. Ct. App. 2009). "[T]he critical inquiry is whether such findings, as adopted by the court, are clearly erroneous." *Id.*

7

The relevant content of the trial court's findings of facts and conclusions of law will be disclosed in our discussion below.

## DECISION

Mother contends that the trial court erred in granting physical custody of A.S. to Grandmother. Mother argues that the evidence is insufficient to overcome the presumption that it is in A.S.'s best interests that she remain in the custody of her natural parent.[2]

In reviewing findings made pursuant to Indiana Trial Rule 52, we first determine whether the evidence supports the findings and then whether the findings support the judgment. *In re Paternity of K.I.*, 903 N.E.2d 453, 457 (Ind. 2009). On appeal, we "shall not set aside the findings or the judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *Id.* (quoting Ind. Trial Rule 52(A)). We will not reweigh the evidence and consider only the evidence favorable to the trial court's judgment. *Allen v. Proksch*, 832 N.E.2d 1080, 1099 (Ind. Ct. App. 2005). Findings are clearly erroneous only when the record contains no facts to support them "either directly or by inference." *Id.* A judgment is clearly erroneous when there is no evidence supporting the findings or the findings fail to support the judgment. *In re K.I.*, 903 N.E.2d at 457. In order to determine that a finding

---

[2] Mother also contends that the trial court erred in finding that Grandmother was A.S.'s de facto custodian. As in *In re Paternity of L.J.S.*, 923 N.E.2d 458, 461 n.1 (Ind. Ct. App. 2010), *trans. denied*, we are not required to address this issue. Assuming without deciding that Grandmother qualifies as a de facto custodian, she "must still overcome the strong presumption in favor of [Mother], the natural parent, in order to gain custody of [A.S.]." *See id.* "Accordingly, we consider whether the trial court committed clear error in concluding that [Grandmother] overcame this presumption." *Id.*

or conclusion is clearly erroneous, we must come to the firm conviction that a mistake has been made. *Allen*, 832 N.E.2d at 1099.

Where, as here, the dispute involves a parent and a third party, we cannot ignore the constitutional implications; the relationship of a parent and a child is of a constitutional dimension. *In re L.J.S.*, 923 N.E.2d at 462. "As the United States Supreme Court has recently reiterated, the Fourteenth Amendment's Due Process Clause protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Id.* (quoting *In re Guardianship of L.L. and J.L.*, 745 N.E.2d 222, 228-29 (Ind. Ct. App. 2001), *trans. denied*). So long as a parent adequately cares for her children, there will normally be no reason for the State to inject itself into the private realm of the family to question the ability of the mother to make the best decisions concerning the rearing of her child. *In re L.L.*, 745 N.E.2d at 229 (citing *Troxel v. Granville*, 530 U.S. 57, 66 (2000)).

In disputes between a natural parent and a third party, a presumption exists that it is in the best interests of the child to be placed in the custody of the natural parent. *Allen*, 832 N.E.2d at 1098. "Indiana law has traditionally recognized that 'natural parents are entitled to custody of their minor children, except when they are unsuitable persons to be entrusted with their care, control, and education.'" *Id.* (quoting *In re Guardianship of B.H.*, 770 N.E.2d 283, 285 (Ind. 2002)). The trial court must be convinced that placement with a person other than the natural parent represents a substantial and significant advantage to the child. *In re Paternity of T.P.*, 920 N.E.2d 726, 731 (Ind. Ct.

9

App. 2010), *trans. denied*. The presumption will not be overcome merely because "a third party could provide the better things in life for the child." *Id*. In a proceeding to determine whether to place a child with a person other than the natural parent, we may consider, among other things, the natural parent's (1) unfitness, (2) long acquiescence in the third party's custody of the child, or (3) voluntary relinquishment of the child such that the affection of the child and third party have become so interwoven that to sever them would seriously mar and endanger the future happiness of the child. *Id*. (citing *In re K.I.*, 903 N.E.2d at 458-59; *Hendrickson v. Binkley*, 161 Ind.App. 388, 394, 316 N.E.2d 376, 380 (1974)) (endorsing above factors but concluding they are non-exclusive for purposes of overcoming natural-parent presumption).[3] At issue is "whether the important and strong presumption that a child's interests are best served by placement with natural parents is clearly and convincingly overcome by evidence proving that the child's best interests are substantially and significantly served by placement with another person." *Id.* The third party has the burden to rebut the presumption that a child should be in the custody of her natural parent. *A.J.L. v. D.A.L.*, 912 N.E.2d 866, 873 (Ind. Ct. App. 2009).

Here, the trial court concluded that Mother's battle with schizoaffective disorder "is of great concern to the Court, particularly when coupled with her history of suicidal ideation, alcohol abuse and life choices that are suspect at best." (Mother's App. 39). It then concluded that "[t]here are simply no corresponding risks attendant to a placement

---

[3] As then Chief Justice Shepard stated in his concurrence in *B.H.*: "If the evidence showed that the natural parent was a fit parent, that he/she was caring regularly for the child, and that no third person was emotionally central to the child's life, what 'non-[*Hendrickson*] factors' would suffice to remove the child from the natural parent?" 770 N.E.2d at 290.

10

of the child with Grandmother." *Id.* In short, the trial court concluded that Mother is unfit to parent A.S.

In support of its decision to grant custody to Grandmother, the trial court cited to testimony that on one occasion Mother's schizoaffective disorder caused her to have suicidal ideations. Although the trial court recognized that the disorder is controlled by medication, it questioned the efficacy of the medication over a long period of time. There is no evidence that Mother now experiences suicidal ideations, and there is no evidence to support the trial court's reservations about Mother's ability to combat the disorder with medication. Indeed, the only evidence in the record on this subject is that the medication is working and that Mother has both the desire and the ability to make sure that appropriate adjustments will be made to the medication to assist her in her battle against the disorder.

In addition, there is no evidence that anyone involved with Mother believes that she will again abuse alcohol. Further, there is no evidence that Mother, a thirty-eight-year-old stay at home mom with a husband and three daughters, is going to return to the gang-related life of her late adolescence. There is evidence, however, that Mother, along with the help of Stepfather, has so far parented an above average student who is articulate, direct and respectful and who enjoys her life with her Mother, Stepfather, and sisters. There is further evidence, as supported by the trial court's finding, that A.S. is "well adjusted" in Mother's home. (Mother's App. 38-39).

11

The trial court also concluded that the relationship between A.S. and Grandmother is "so strong, compelling and interwoven that if it were not continued, it would potentially be harmful to the future wellbeing of [A.S.]." (Mother's App. 39). This conclusion is not supported by the trial court's finding that A.S., while sad about being physically separated from her Grandmother, has made the appropriate adjustment to that separation while still missing her Grandmother. In addition, this finding ignores Grandmother's testimony that Grandmother and Mother jointly shared caregiving of A.S. from shortly after her birth in 2002 until April of 2007, a finding that supports a bond with both Mother (the natural parent) and Grandmother (the third party). Finally, the conclusion is inconsistent with the trial court's stated intention that physical custody of A.S. be eventually awarded to Father.

While it appears that Grandmother and Mother joined forces in caring for A.S. during the period lasting from shortly after A.S.'s 2002 birth until April of 2007 and that Grandmother provided valuable assistance by caring for A.S. on school days during the months of the 2007/2008 school year, these acts do not frame the issue before the trial court. *See L.J.S.*, 923 N.E.2d at 465. Rather, the issue is "whether the important and strong presumption that [A.S.'s] best interests are best served by placement with [Mother] were clearly and convincingly overcome by evidence proving that the child's best interests are substantially and significantly served by placement with [Grandmother]." *Id.* (citing *In re B.H.*, 770 N.E.2d at 287). Even when we consider the evidence most favorable to the trial court's judgment, without reweighing that evidence

or judging the credibility of the witnesses, we must conclude that the evidence does not support the trial court's conclusion that Grandmother has overcome the aforementioned presumption. In short, the trial court's judgment is not supported by clear and convincing evidence, leading us to the firm conviction that a mistake has been made.

## CONCLUSION

We reverse and remand with instructions that the trial court vacate its award of physical custody to Grandmother, thereby returning custody to Mother. The trial court shall determine the details of Father's visitation. It shall also determine what, if any, visitation rights are due to Grandmother under the Grandparent Visitation Act.

Reversed.

ROBB, C.J., and MAY, J., concur.