## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 14 2018, 8:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cynthia A. Marcus
Marcus Law Firm, LLC
Carmel, Indiana

ATTORNEY FOR APPELLEE

James D. Metzger
The Law Office of James D.
Metzger, LLC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Christopher Vicoli,

*Appellant/Cross-Appellee-Petitioner,*

v.

Ashley Mullica (Vicoli),

*Appellee/Cross-Appellant-Respondent.*

August 14, 2018

Court of Appeals Case No.
41A04-1711-DR-2624

Appeal from the
Johnson Superior Court

The Honorable
G. Thomas Gray, Senior Judge

Trial Court Cause No.
41D02-1405-DR-317

**Kirsch, Judge.**

[1] Christopher Vicoli ("Father") appeals the trial court's denial of his petition to modify custody. Father raises the following restated issues for our review:

I. Whether the trial court abused its discretion when it denied Father's petition for modification of custody because, Father alleges, the trial court based its determination on several findings of fact and conclusions thereon that were not supported by the evidence;

II. Whether the trial court abused its discretion when it restricted Father's parenting time by denying mid-week visitation; and

III. Whether the trial court abused its discretion when it denied Father's request to modify child support and ordered the original support order to remain in effect.

Ashley Mullica (Vicoli) ("Mother") raises several cross-appeal issues, which we restate as:

I. Whether Father timely filed his notice of appeal;

II. Whether the trial court abused its discretion when it excluded evidence of alleged domestic violence by Father against Mother; and

III. Whether the trial court abused its discretion when it denied Mother's request for attorney fees pursuant to the Agreed Entry of June 26, 2014.

[2] We affirm in part, reverse in part, and remand.

## Facts and Procedural History

[3] Mother and Father are the parents of eight-year old L.V. ("Child"). Mother and Father lived in England together until their marriage was dissolved in

October 2012, at which time Mother moved back to the United States with Child and her older sibling, K.S.[1] Child was three years old at the time she moved back to the United States with Mother. An Agreed Entry was entered on June 26, 2014, which gave the parents joint legal custody of Child, granted Mother primary physical custody of Child, and ordered Father to pay child support in the amount of $500 per month. *Appellant's App. Vol. 2* at 16-20; *Pet'r's Ex.* 1. Father remained in England after the dissolution and operated a Subway franchise until August 2016. During the time that he remained in England, Father exercised regular contact with Child pursuant to the Agreed Entry, including communicating through Skype and having visitations in England and in the United States during summer and school holidays. While in England, Father remarried.

[4] Child has lived with Mother since birth. *Tr. Vol. 2* at 76. Child suffers from Attention Deficit Hyperactivity Disorder ("ADHD") and Major Depressive Disorder. *Id*. at 85. K.S. suffers from Asperger's Syndrome and Oppositional Defiant Disorder. *Id*. at 77. Child and K.S. have spent their entire lives together and are very close. *Id*. at 78, 80. K.S.'s condition results in meltdowns as a response to change, and therefore, structure in her life is important. *Id*. at 77. Child also gets upset when her structure or routine is broken or disrupted. *Id*. at 86.

---

[1] Father is not the father of K.S., who was born prior to the marriage between Father and Mother.

[5]     In May 2012, Mother met Joe Mullica ("Joe"), and they began living together shortly thereafter. Mother and Joe subsequently had a child together, born in March 2013 and another born in April 2017. In July 2014, while in Florida on vacation, Joe became intoxicated and strangled Mother. *Pet'r's Ex.* 5. Child was not present at the time of the battery. Joe was arrested, but at Mother's request, the Florida criminal case against Joe was dismissed. *Pet'r's Exs.* 5, 6. The Indiana Department of Child Services ("DCS") conducted an investigation regarding Child as a result of the incident in Florida, and neglect of Child was unsubstantiated. *Pet'r's Ex.* 7. Father was notified of the Florida incident by DCS and by Mother. In July 2015, Mother filed for a protective order against Joe based on domestic violence incidents from 2012 through 2015. *Pet'r's Ex.* 8. Mother later requested that the ex parte protective order be dismissed because she wanted to work on her relationship with Joe and have the two of them attend counseling. *Tr. Vol. 2* at 39; *Pet'r's Ex.* 8. The protective order case was dismissed, but the parties did not attend domestic violence or marital counseling. *Tr. Vol. 2* at 169.

[6]     In April 2016, Mother attempted to commit suicide by ingesting large amounts of her thyroid medication. *Pet'r's Ex.* 10. Father, who was still in England at the time, learned of this through DCS. On April 19, 2016, Mother filed for another protective order against Joe alleging domestic violence and stalking from 2012 through 2016. *Pet'r's Ex.* 9. After an investigation that was initiated as a result of Mother's suicide attempt, DCS found neglect of Child to be unsubstantiated because Child felt safe in Mother's home. *Pet'r's Ex.* 10.

During the investigation, Mother told DCS she was attending counseling. *Id.* On May 23, 2015, Mother voluntarily dismissed the April 2016 ex parte protective order. *Pet'r's Ex.* 9. Mother and Joe got married the next day and moved into a new 5,000 square foot home shortly thereafter as part of their plan to remove negative influences from their life. *Tr. Vol. 3* at 7-8. When Mother vacated her apartment, it had sustained damage, including medium and large sized holes in the walls and broken doors. *Pet'r's Exs.* 15,16.

[7] On June 10, 2016, Father filed a petition for modification of the Agreed Entry, which requested a modification of custody, child support, and parenting time. A hearing was held on Father's petition on June 26 and 27, 2017 and concluded on July 18, 2017. At the hearing, Mother testified that a change in the amount of contact between Child and K.S. would have a substantial and detrimental effect on both children because both children because of the disruption to their routine and structure. *Tr. Vol. 2* at 80. Krista Anderson ("Anderson"), a licensed marriage and family therapist, met with Child and familiarized herself with Mother and Father and Child's interactions with them. *Id.* at 175-176. Anderson testified that if Child were to spend less time with her siblings, and K.S. especially, it would have a substantial effect on the children. *Id.* at 196-197.

[8] At the time of the hearing, Father had been exercising parenting time from Wednesday to Monday morning every other week after since his move back to the United States in 2016. Mother testified that Child was exhibiting anxiety for some reason related to the transition. *Id.* at 201-202. Child had begun

wetting her bed the night before going to stay with Father, which she had not done since Father came back for the first time to visit after she and Mother returned to the United States from England. *Id*. at 81. Mother also stated that Child had also become more aggressive, sarcastic, and emotional since seeing Father on a more regular basis. *Id*. Child informed the trial court in an in-camera interview that she did not like the mid-week transition and told the custody evaluator that she wanted the schedule that "makes [her] more at [her] mom's house." *Tr. Vol. 4* at 38; *Pet'r's Ex*. 11 at 9.

[9]   As to the incidents of domestic violence between Mother and Joe, Mother testified that Joe only "even laid hands on [her]" during the incident in Florida, which Child did not witness. *Tr. Vol. 2* at 109-10. Mother also stated that, although there were allegations of verbal arguments between her and Joe, Child witnessed very few of those. *Id*. at 110. Mother testified that, even though she made the statements under the penalties of perjury, she misrepresented and exaggerated the facts that she included in both of the petitions for protective order that she filed. *Id*. at 33-38, 41-45. Joe testified at the hearing and admitted that he has an anger problem, and at the time of the hearing, he had begun seeing a therapist and had attended two sessions. *Id*. at 237; *Tr. Vol. 3* at 209. Joe also previously engaged in eight and a half weeks of online anger management after the incident in Florida. *Tr. Vol. 2* at 241. He did not complete the course because his computer broke, and he could not afford a new one. *Id*. at 240. Joe told the court that he was not opposed to participating in counseling, but that financial restraints had impaired his ability to gain

treatment in the past; however, he now had the means through insurance to obtain treatment. *Tr. Vol. 3* at 14, 17. Mother and Joe testified that they had recognized negative influences in their lives and distanced themselves from such influences and had moved into a larger home that allowed more space, so they could go to different areas when conflict arises. *Tr. Vol. 2* at 127-28; *Tr. Vol. 3* at 7-8.

[10] At the time of the hearing, Mother was in the training process to become a school bus driver. She was making between $12 and $13 per hour and was only allowed to train for two to four hours per day. In order to be a school bus driver, Mother would have to obtain her CDL license and pass a training test. She would then make $21 per hour and would be considered a substitute bus driver and would work four to six hours a week depending on her route. Mother would not be guaranteed to work a full week until she becomes a bus driver and has a route of her own which could take up to a year. At the time of the hearing, she was working part time in her brother's cell phone store for supplemental income, working approximately twenty hours per week and making $8 per hour. Prior to having her fourth child in April 2017, Mother was employed with the U.S. Postal Service, earning about $17 per hour, but after going on maternity leave, she resigned to spend more time with her children.

[11] At the time of the hearing, Father was working part time as a tutor at both Ivy Tech and Bender and Rocap. Father earned between $13-14 per hour at Ivy Tech and $40 an hour at Bender and Rocap. He had applied for four or five jobs in the year since he moved back to the United States. Father spent some

$80,000 from the sale of his Subway restaurant in England to purchase a rental property. Father was hoping to pick up new clients with the tutoring agency. He had only been there six months and after six months he would "move up the pecking order" and gain more opportunities to get additional clients. *Tr. Vol. 3* at 192. Father testified that he was looking for additional employment that would pay more than what he was making at the time. Father also expected that his vacant rental property would become occupied, which would provide more income. Father remarried in 2016, and at the time of the hearing, had a newborn baby with his second wife. Child had known Father's new wife for five years. Father and his wife purchased a home in the Castleton area, where they resided.

[12] At the conclusion of the hearing, the trial court denied Father's petition and denied his request for modification of custody and ordered that Father be entitled to exercise parenting time per the Indiana Parenting Time Guidelines ("Parenting Time Guidelines"), but ordered he was not entitled to mid-week parenting time, finding that it was inappropriate in the present case and not in the best interest of Child. *Appellant's App. Vol. 2* at 10-14. The trial court also ordered that Father's child support obligation should remain in the amount of $500 per month as originally ordered in the Agreed Entry because the parties incomes were in a "state of flux" at the time of the hearing, and an accurate child support calculation could not be made at that time. *Id*. at 14. Father now appeals. Additional facts will be added as necessary.

# Discussion and Decision

## I.    Timeliness of Notice of Appeal

[13]    Initially, we address Mother's contention that Father failed to timely file his notice of appeal.  Because the determination of this issue could be dispositive, we will resolve it first.  Mother argues that Father's notice of appeal was not filed in a timely manner because it was not filed within thirty days of the trial court's oral pronouncement of its denial of Father's petition for modification of custody.

[14]    Assuming without deciding that Father failed to timely file his notice of appeal, we proceed to determine the case on its merits.  Although under Indiana Appellate Rule 9(A)(5) the untimely filing of a notice of appeal forfeits the right to appeal, Indiana courts have concluded that the question is whether there are extraordinarily compelling reasons why the appeal should be allowed.  *In re Adoption of O.R.*, 16 N.E.3d 965, 971 (Ind. 2014); *Robertson v. Robertson*, 60 N.E.3d 1085, 1090 (Ind. Ct. App. 2016).  First, the Appellate Rules themselves provide a mechanism allowing the an otherwise forfeited appeal to be resurrected.  *See* Ind. Appellate Rule 1 (providing in relevant part that the "Court may, upon the motion of a party or the Court's own motion, permit deviation from these Rules").  *In re O.R.*, 16 N.E.3d at 972.  Second, a parent's interest in the custody of his child is a fundamental liberty interest, and the parent-child relationship is one of the most valued relationships in our culture.  *Id.*; *Robertson*, 60 N.E.3d at 1090.  Based on this reasoning, we conclude that Father's appeal deserves a determination on the merits.

## II.    Custody Determination

Father first argues that the trial court abused its discretion when it denied his petition to modify custody, which requested that custody be changed from Mother to him.  Indiana appellate courts grant latitude and deference to our trial courts in family law matters.  *Miller v. Carpenter*, 965 N.E.2d 104, 108 (Ind. Ct. App. 2012).  Modifications of child custody are reviewed for an abuse of discretion.  *Id.*  We do not reweigh the evidence or judge the credibility of the witnesses.  *Id.*  Instead, we view only the evidence favorable to the trial court's judgment and the reasonable inferences that may be drawn from this evidence.  *Id.*

The trial court here entered findings of fact and conclusions thereon when it denied modification.  Pursuant to Indiana Trial Rule 52(A), we do not "set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses."  Factual findings are only clearly erroneous where there is no support for them in the record, either directly or by inference; a judgment is only clearly erroneous when it applies an improper legal standard to proper facts.  *Johnson v. Johnson*, 999 N.E.2d 56, 59 (Ind. 2013).  In either case, we must be left with the firm conviction that a mistake has been made.  *Id*.

We reiterate and emphasize that "[j]udgments in custody matters typically turn on essentially factual determinations and will be set aside only when they are clearly erroneous."  *Baxendale v. Raich*, 878 N.E.2d 1252, 1257 (Ind. 2008).  The

appellate court will not substitute its own judgment if any evidence or legitimate inferences support the trial court's judgment. *Id*. at 1257-58. "The concern for finality in custody matters reinforces this doctrine." *Id.*

[18] Father contends that a number of the trial court's findings were not supported by the evidence. Specifically, he takes issue with Findings 4, 6, 7, 8, 9, 10, 12, 14, 17,18, 19, 20, and 21. Father claims that, because these findings were not supported by the evidence and because the findings, therefore, do not support the judgment, the trial court's judgment leaving Child in Mother's custody was clearly erroneous.

[19] Father alleges that Finding 4, which stated "[Mother] has been in the child's life consistently since the child's birth and has had physical custody of the child since the divorce," *Appellant's App. Vol. 2* at 10, was not supported by the evidence. At the hearing, Mother testified that she had lived with Child since birth and had been the custodial parent since her divorce with Father. *Tr. Vol. 2* at 76. Therefore, evidence was presented to support Finding 4. Father's argument that "This finding is contradicted by the import of the totality of the other findings made (or ignored) by the trial court" appears to be a request that we reweigh the evidence, which we cannot do on appeal. *See Miller*, 965 N.E.2d at 108.

[20] Finding 6 stated,

> There have been several substantial changes in circumstances including both parents remarrying, the addition of new siblings, Petitioner returning to the United States in 2016 after living in

> England since the divorce in 2012 while child lived in the United States with Respondent and the child moving into a different home with Respondent.

*Appellant's App. Vol. 2* at 11. Father contends that this finding ignored the crux of the case, which was that family violence existed in Mother's home and that family violence was a substantial change in circumstances. All of the information in the finding was supported by evidence presented at the hearing, both Mother and Father had remarried and had additional children with their new spouses, Father had returned to the United States, and Child had moved into a new home with Mother and her new husband. *Tr. Vol. 2* at 18-19, 108, 126; *Tr. Vol. 3* at 55, 77, 90-91. Although the trial court did not list the family violence that had occurred in Mother's home in this finding, it did consider the evidence of domestic violence presented at the hearing when it found that there were three episodes of domestic violence between Mother and Joe and that Joe had an anger problem. *Tr. Vol. 4* at 35-36; *Appellant's App. Vol. 2* at 11. The trial court further found that Joe's anger problem was "a troubling fact" to the trial court. *Tr. Vol. 4* at 36. We, therefore, conclude that the evidence supported Finding 6.

[21] Father asserts that Finding 7, which stated that, "There have been three instances of domestic violence between [Mother] and [Joe]," which occurred in "July of [2014], July of [2015], and April of [2016]," was not supported by the evidence. *Appellant's App. Vol. 2* at 11; *Tr. Vol. 4* at 35. Father contends that this is because Mother's two petitions for protective order contained multiple

instances of alleged domestic violence, and at the hearing, Mother testified that the allegations in those petitions were exaggerated and misrepresented. *Tr. Vol. 2* at 33-38, 41-45. Father's argument is just a request for this court to reweigh the evidence and assess Mother's credibility. At the hearing, Mother testified that Joe did in fact choke her during the incident in Florida in July 2014 that was reported to the police. *Id.* at 25-26. She also admitted that Joe threatened to kill her parents on July 23, 2015 and that he hit her in the arm. *Id.* at 37, 41-42. As to the other incidents that were contained in the petitions for protective order, mother testified that they were exaggerated or misrepresented in order to obtain the protective order, and the trial court either chose to believe Mother's testimony on this account or believe that what was reported did not constitute domestic violence. There was evidence that Joe caused property damage to their old apartment, but property damage does not, alone, constitute domestic violence.[2] *Id.* at 32, 43-45. Mother also testified that Joe held her down one time, but no further details of the incident were given; testimony was also given that Joe "would say mean things to [Mother]," which also does not alone fit the definition of domestic violence. *Id.* at 35, 42. Evidence was presented that supported Finding 7.

[22] Finding 8 stated, "Erica Oaks of DCS gave testimony that while violence did occur, the child did not see the violence, the child felt safe in [Mother]'s home,

---

[2] Indiana Code section 31-9-2-42 defines domestic or family violence in pertinent part as: "(1) attempting to cause, threatening to cause, or causing physical harm to another family or household member without legal justification; (2) placing a family or household member in fear of physical harm without legal justification."

and the DCS investigation indicated the allegations that the child was a child in need of services were unsubstantiated." *Appellant's App. Vol. 2* at 11. Father argues that this finding is clearly erroneous because the trial court used the wrong legal standard, asserting that the standard of proof for CHINS cases does not apply in a custody modification case. *Appellant's Br.* at 22-23. However, this argument seems misplaced as the finding does not apply the CHINS standard to the present case, but merely stated testimony given by Erica Oakes ("FCM Oakes"), who conducted an assessment of alleged child abuse or neglect for DCS in April 2016. FCM Oakes testified that, in her investigation, she learned that Joe hit Mother in the arm, but that it did not take place in front of the children. *Tr. Vol. 2* at 53. FCM Oakes further stated that she spoke with Child, who told FCM Oakes that she felt safe in Mother's home, and FCM Oakes found that the allegations that Child was a CHINS to be unsubstantiated. *Id.* at 56, 58. Therefore, Finding 8 was supported by the evidence.

[23]     Finding 9 stated:

> The Court found witness Krista Anderson, a family and marriage therapist, to be quite astute and placed great weight upon her testimony. Significantly, Anderson opined that while the child might be at risk for being a victim of domestic violence that she had not been a victim of violence. Ms. Anderson also opined that less contact between the child and her siblings in this specific case will have a negative and substantial effect on the child.

*Appellant's App. Vol. 2* at 11. Father takes issue with the portion of the finding where the trial court stated that it found "Anderson 'to be quite astute and placed great weight upon her testimony,'" claiming that this finding was clearly erroneous because the finding did not take into account other testimony by Anderson regarding hypothetical long lasting effects of exposure to domestic violence. *Appellant's Br*. at 23. The record shows that Anderson did testify that, while Child might be at risk for being a victim of domestic violence, she had not been a victim. *Tr. Vol. 2* at 184, 191-92. Further, the record reflects that there no evidence was presented that Child has been a victim of domestic violence or has been exposed to it. Mother testified that Child never saw any physical violence, witnessed few arguments, and she and Joe took measures to keep it away from the children even when in the apartment. *Id*. at 110. Child stated to FCM Oakes "that her mom and [Joe] do not argue often" and told the custody evaluator, "Mom and Joe might argue, but it is not anything bad." *Ex.* 10 at 3; *Ex*. 11 at 9*.* Much of Father's argument focuses on statistical evidence and generalized information about whether a domestic batterer will also victimize a child, which the trial court had an opportunity to hear, as well as the testimony of the witnesses regarding the parties and the present situation. Father's contention is just a request to reweigh the evidence. Finding 9 was supported by the evidence.

[24]     Father next contends that Finding 10, which stated, "That Joe Mullica, current husband of [Mother] does have an anger problem, but is addressing it," was not supported by the evidence. Specifically, Father argues that the part of the

finding that stated that Joe was addressing his anger problem was not supported by the record because Joe had not yet completed counseling at the time of the hearing. Joe testified that he is not opposed to participating in treatment but had been hindered due to financial reasons. *Tr. Vol. 3* at 13-14. At the time of the hearing, Joe had been seeing a therapist at the same place where Mother and Child attend, had been to two sessions with three more scheduled, was attending once a week, and was working on issues of things that happened to him when he was younger. *Id*. at 209. Both Mother and Joe testified that they had been learning things to help them cope with stress and how to deal with situations and talk with each other. *Tr. Vol. 2* at 111; *Tr. Vol. 3* at 7-9. Evidence was presented that supported the trial court's Finding 10.

[25] Father asserts that Finding 12, which stated, "[Mother] is making appropriate steps with her employment that are suited to address the best interests of the child," was not supported by the evidence presented. *Appellant's App. Vol. 2* at 11. Father argues that the finding was not supported because the evidence showed that Mother had quit her employment with the postal service, where she was making around $17 per hour, and was only working part time at her brother's store where she was making $8 per hour at the time of the hearing. The evidence at the hearing showed that Mother had recently quit her job working for the postal service and had begun training to become a school bus driver, which would allow her to spend more time with her children. *Tr. Vol. 2* at 112-13. Mother testified that, after her training, her pay as a bus driver would be higher per hour than her previous position, but she would work fewer

hours which would allow her to spend more time with her children while making a similar amount of money. *Id*. at 112. Mother would not be working during the summers and would be able to spend that time with her children, and her hours at work would be more predictable than they were at the postal service. *Id*. at 15-16, 112-13. Mother stated that her job with the postal service was extremely stressful, which contributed to her suicide attempt, and the trial court could infer that changing her employment would alleviate that stress and help make her a better parent. *Id*. at 118-19. Evidence was presented to support Finding 12.

[26] Finding 14 stated, "[Mother] is bettering herself particularly by moving into a larger home, learning to create space between her and Joe when conflict arises, and by having removed those who create negative influences from her family's life." *Appellant's App. Vol. 2* at 12. Father claims that the record did not contain evidence to support this finding because no evidence suggested that Mother was bettering herself by doing the things listed in the finding and that making the changes listed in the finding will not cure a domestic abuser, citing to testimony by Anderson. However, Father's contention does not properly characterize Anderson's full testimony. Although she did state that moving into a larger house would not cure a domestic batterer, Anderson did testify that removing negative influences would be a necessary step to break the cycle of violence. *Tr. Vol. 2* at 190. Anderson further stated that she teaches children and victims of violence to "take their own space" wherever they happen to be as a mechanism to remove themselves from a violent situation. *Id*. at 190-91. Further, although

Father takes issue with the fact that the listed things in the finding will not cure a domestic batterer, the trial court only stated in the finding that Mother was bettering herself by doing these things, not curing Joe. Sufficient evidence was presented to support Finding 14.

[27] Finding 17 stated, "Exhibit 36 shows the antagonistic nature of [Father]'s attitude towards [Mother] and her family." *Appellant's App. Vol. 2* at 12. Father asserts that this finding is clearly erroneous and not relevant because the trial court should not have made the finding based on a single short series of text messages. Exhibit 36 was a series of text messages between Father and Mother's father ("Grandfather"), in which Grandfather asked that Father stop harassing Mother though text messages, and Father responded that "if [Mother] can't defend herself then maybe she isn't adult enough to raise a child" and continued to explain that he only informed Mother about Child's health and that Child should have had a coat. *Pet'r's Ex.* 36. Father then stated that Mother was "being dramatic," and Grandfather again asked Father to stop harassing Mother and that Father should have been responsible for Child having a coat when it was Father's visitation time with Child. *Id.* Mother also recounted a time when she and Father had a conversation about him not returning clothing sent with Child on visitations with Father, to which he responded that, because he paid child support, the clothing was his. *Tr. Vol. 2* at 88. Mother also recounted that during a Christmas break, the parties attempted to negotiate parenting time for the holidays, and Father just ended up keeping Child for the time he wanted anyway. *Id.* at 131-32. We, therefore,

conclude that the trial court's finding was supported by the evidence presented. A large portion of Father's argument alleges that the trial court focused on Father's antagonistic nature but ignored evidence of Joe's domestic violence. This allegation is a request to reweigh the evidence and minimize Father's antagonistic interactions with Mother and other members of her family, which reflect on Father's ability to cooperate with Mother and with visitation schedules.

[28] Father next asserts that Finding 18, which stated, "The Court finds it telling that half of the clothes that [Father] had for the child, came from the [Mother]," is not supported by the evidence. *Appellant's App. Vol. 2* at 12. He claims that both parents have an obligation to provide for Child, and the logical inference from the finding is that Father contributed half of Child's clothing. Mother testified that Father did not return the clothing she sent with Child for visitations and told Mother the clothes were his because he paid child support. *Tr. Vol. 2* at 87-88. The Parenting Time Guidelines states that, "[t]he the custodial parent shall send an appropriate and adequate supply of clean clothing with the child and the non-custodial parent shall return such clothing in a clean condition." Ind. Parenting Time Guideline I(B)(3). We conclude that Finding 18 was supported by the record.

[29] Father maintains that Finding 19, which provided, "The child exhibits anxiety before going to [Father]'s residence for some reason," was not supported by the record. *Appellant's App. Vol. 2* at 12. He asserts that, because Anderson testified that she was unable to determine the source of Child's anxiety, no evidence

supported a causal link that the anxiety was caused by Father. Anderson did testify that Child experienced anxiety and bedwetting, but she was not sure of the reason behind this, and she opined that the anxiety was due to transition and that it could be "with father, but [she] couldn't speak to that." *Tr. Vol. 2* at 201-02. Mother also testified that Child had begun to wet her bed before she went to Father's home. *Id*. at 81. This evidence was sufficient to support an inference by the trial court that Child was experiencing anxiety prior to going to Father's home, and therefore, Finding 19 was supported by the record.

[30] Father contends that Finding 20, which stated, "[Father] did not want mid-week visits for [Mother] if he were granted custody and [Mother] given parenting time," was not supported by the evidence. *Appellant's App. Vol. 2* at 12. Father claims that the finding is a misinterpretation of his "testimony, reasoning, and logic" and that the finding did not mention the best interest of Child. *Appellant's Br.* at 29. During the hearing, when asked what his proposal for Mother's visitation would be if he was given custody, Father stated "[t]hat she would have [Child] every other weekend plus, . . . liberal visitation for holidays and birthdays and vacations." *Tr. Vol. 3* at 195. When questioned at another time what he thought would be appropriate for visitation, Father testified "I think alternating weekends work well" and "if distance is a concern for [Mother], could you extend the weekends a bit, rather than having the midweek sort of visits." *Id*. at 76. Evidence was presented to support Finding 20.

[31] Finding 21 stated,

> The Court finds of paramount significance that while [Father] claims he is concerned about the child's safety while in [Mother]'s care, such being the crux of his Petition, that [Father] never once stated or asked of the Court that [Mother]'s husband, Joe Mullica, be restricted either from the home entirely should [Mother] remain the custodial parent or during parenting time should the Court grant physical custody to [Father]. This indicates to the Court that [Father] is not as truly concerned with danger in [Mother]'s home while Joe Mullica is there as [Father] claims to be.

*Appellant's App. Vol. 2* at 12. Father contends that this is not a finding of fact, but a conclusion by the trial court and that, during his testimony, he articulated his fear for child's safety. While we agree with Father that Finding 21 contained conclusory language, the factual statements are supported by the evidence. Nowhere in the record did Father request that Joe somehow be restricted from the home if Mother retained custody or during Mother's visitations should Father receive custody. Further, contrary to Father's assertion, the trial court did find that Father claimed he was concerned for Child's safety while in Mother's care, but questioned the strength of his concern. We do not conclude that Finding 21 was clearly erroneous.

[32] Father next argues that, based on the record, it is clear that the evidence did not support the trial court's findings, and the findings are clearly erroneous and do not support the trial court's judgment to deny Father's petition for modification of custody of Child. As explained above, the evidence presented supported the trial court's findings, and we conclude that the trial court's judgment was supported by the findings and the record. It is not necessary that each and

every finding be correct, and even if one or more findings are clearly erroneous, we may affirm the judgment if it is supported by other findings or is otherwise supported by the record. *Clary-Ghosh v Ghosh*, 26 N.E.3d 986, 990 (Ind. Ct. App. 2015), *trans. denied*. When reviewing the accuracy of findings, we first consider whether the evidence supports them and then consider whether the findings support the judgment. *Id.*

[33] Here, the findings showed that Child, who was eight years old at the time of the hearing, had lived consistently with Mother for Child's entire life and that Mother had physical custody of Child since the divorce in 2012. Although Child was the only child of the marriage between Mother and Father, Mother had other children including an older child, with whom Child had a close bond. Testimony was given by a family therapist, Anderson, that if Child were to spend less time with her siblings, especially her older sister, it would have a substantial effect on Child and all of the children. *Tr. Vol. 2* at 196-97. While less contact between any child siblings who have grown up together could be a substantial change, the specific children in this case present a much stronger case that less contact between them would be harmful. Child suffers from ADHD and Major Depressive Disorder and has been in counseling with Adult and Child services since kindergarten, which Mother felt was important to continue because the counseling teaches Child important everyday skills such as grooming and homework and skills to help in her relationship with her older sister, who suffers from Asperger's Syndrome. *Id.* at 82-83, 85. Anderson also

noted that Child has anxiety before going to Father's house, but was not sure why this was occurring. *Id*. at 201-02.

[34] Although the trial court acknowledged that there had been incidents of domestic violence between Mother and Joe, the evidence showed that Child had not been a victim of domestic violence and had not been present when the incidents between Mother and Joe had occurred. *Id*. at 110, 191-92. FCM Oakes testified that she spoke with Child, who told FCM Oakes that she felt safe in Mother's home, and FCM Oakes found that the allegations that Child was a CHINS were unsubstantiated. *Id*. at 56, 58. There was also testimony that Mother and Joe were seeking treatment and learning ways to help them cope with stress and to deal with situations and talk with each other. *Id*. at 111; *Tr. Vol. 3* at 7-9. Mother also testified that she had recently quit her stressful employment with the postal service and was training to drive a school bus, which would allow her to spend more time with her children. *Tr. Vol. 2* at 112-13.

[35] The trial court found it compelling that, although Father stated he was concerned with Child living in Mother's home due to Joe's anger and domestic violence issues, Father did not request any restriction of Joe being around when Child visited if custody was modified in favor of Father. The trial court interpreted this as demonstrating that Father's actual reasoning for custody modification was that he just wanted to have custody of Child and not that a change of circumstances had occurred. *Tr. Vol. 4* at 37. We find this to be a reasonable inference and within the trial court's discretion. The trial court's

findings supported its judgment, and the trial did not abuse its discretion in denying Father's petition for custody modification. Father's argument that Mother's ability to protect is compromised is a rehashing of his prior assertions and is a request for this court to reweigh the evidence, which we cannot do on appeal. *Miller*, 965 N.E.2d at 108.

## III. Parenting Time

[36] Father next argues that the trial court abused its discretion when it restricted his parenting time by not allowing mid-week visitations with Child. In matters of child custody and visitation, foremost consideration must be given to the best interests of the child. *Richardson v. Richardson*, 34 N.E.3d 696, 701 (Ind. Ct. App. 2015) (citing *Lindquist v. Lindquist,* 999 N.E.2d 907, 911 (Ind. Ct. App. 2013)). We will generally reverse child visitation decisions only upon a showing of a manifest abuse of discretion. *Id.* We do not reweigh the evidence or reexamine the credibility of the witnesses. *Id.* Instead, we view the record in the light most favorable to the trial court's decision to determine whether the evidence and reasonable inferences therefrom support the trial court's ruling. *Id.*

[37] Father takes issue with several of the trial court's findings, contending that they are not support by the evidence. Factual findings are only clearly erroneous where there is no support for them in the record, either directly or by inference; a judgment is only clearly erroneous when it applies an improper legal standard

to proper facts. *Johnson*, 999 N.E.2d at 59. In either case, we must be left with the firm conviction that a mistake has been made. *Id.*

[38] Under Indiana Code section 31-17-4-2, a trial court may modify an order granting or denying parenting time whenever such modification would be in the best interests of the child, but a trial court shall not restrict a parent's parenting time unless it finds that such parenting time might endanger the child's physical health or significantly impair the child's emotional development. Our Supreme Court has held that:

> [e]xtraordinary circumstances must exist to deny parenting time to a parent, which necessarily denies the same to the child. If the trial court finds such extraordinary circumstances do exist, then the trial court shall make specific findings regarding its conclusion that parenting time would endanger the child's physical health or significantly impair the child's emotional development.

*Perkinson v. Perkinson*, 989 N.E.2d 758, 765 (Ind. 2013). Therefore, even though Indiana Code section 31-17-4-2 uses the word "might," this court has previously interpreted the language to mean that a court may not restrict parenting time unless that parenting time "would" endanger the child's physical health or emotional development. *Hatmaker v. Hatmaker*, 998 N.E.2d 758, 761 (Ind. Ct. App. 2013), *trans. denied*.

[39] Here, the trial court made the following determinations regarding parenting time:

26. [Father] shall be entitled to exercise parenting time per the Indiana Parenting Time Guidelines.

27. Guidelines shall mean every other weekend, holidays, and special days as delineated in the guidelines.

28. [Father] shall not be entitled to the mid-week parenting time contemplated by the Indiana Parenting Time Guidelines. The Court has never been in favor of transporting children back and forth mid-week. The child in this case does not like the mid-week transportation that has heretofore occurred under the most recent custody agreement and [Father] testified that if given custody he would not want [Mother] to have mid-week parenting time. Given these circumstances, the Court therefore believes that the mid-week visit called for by the Indiana Parenting Time Guidelines is inappropriate in this case and not in the best interest of the child.

*Appellant's App. Vol. 2 at 13.*

[40] It is apparent from the trial court's order that it restricted Father's parenting time with Child from what is set out in the Parenting Time Guidelines. In section II(D)(1)(b) of the Parenting Time Guidelines, it states that regular parenting time for a non-custodial parent of a child over the age of three includes, "One (1) evening per week, preferably in mid-week, for a period of up to four hours but the child shall be returned no later than 9:00 p.m." In the introduction to section II of the Parenting Time Guidelines, it states that the provisions contained in that section "represent the minimum recommended time a parent should have to maintain frequent, meaningful, and continuing contact with a child." Ind. Parenting Time Guidelines II(A). Therefore, by

ordering that Father was not entitled to mid-week parenting time with Child, the trial court restricted his parenting time, which is not permitted "unless [the trial court] finds that such parenting time might endanger the child's physical health or significantly impair the child's emotional development." Ind. Code § 31-17-4-2.

[41] We do not find it apparent from the face of the trial court's order that it found that parenting time with Father would endanger Child's physical health or significantly impair Child's emotional development. The trial court found that Child exhibited anxiety before going to Father's house, but no reasoning for this anxiety was given. *Appellant's App. Vol. 2* at 12. In its conclusion determining that Father shall not be entitled to mid-week parenting time, the trial court found that Child did not like mid-week visitation, that Father would not have given Mother mid-week visitation had he been granted custody, and that the trial court was not in favor of transporting children back and forth mid-week as reasons justifying its determination. *Id.* at 13. This reasoning is not sufficient to show that mid-week parenting time with Father would endanger Child's physical health or significantly impair her emotional development. We, therefore, reverse the trial court's parenting time determination and remand to the trial court to determine whether mid-week parenting time with Father endangers Child's physical health or significantly impairs Child's emotional development. If not, we direct the trial court to restore Father's parenting time to that which is recommended as the minimum time, including mid-week visitation or equivalent time, under the Parenting Time Guidelines.

# IV. Child Support

[42] Father asserts that the trial court abused its discretion when it failed to recalculate his child support obligation. In reviewing the trial court's decision regarding the modification of child support, we reverse only for an abuse of discretion. *Holtzleiter v. Holtzleiter*, 944 N.E.2d 502, 505 (Ind. Ct. App. 2011). An abuse of discretion occurs when the decision is clearly against the logic and effect of the facts and circumstances before the court, including any reasonable inferences therefrom. *Id.* "Whether the standard of review is phrased as 'abuse of discretion' or 'clear error,' the importance of first-person observation and preventing disruption to the family setting justifies deference to the trial court." *Id.* (quoting *MacLafferty v. MacLafferty,* 829 N.E.2d 938, 940-41 (Ind. 2005)).

[43] Father argues that the trial court "abdicated its role as a fact finder, failed in his responsibilities, and abused his discretion" in it is decision to keep Father's child support obligation at the same amount as originally ordered in the Agreed Entry. *Appellant's Br*. at 40. Father contends that there was substantial evidence presented regarding the parties' incomes that would have enabled the trial court to make a determination regarding child support. He maintains that the trial court's failure to make a finding as to the parties' incomes for child support purposes was an abuse of discretion and not supported by the facts and circumstances presented to the trial court.

[44] In its order, the trial court determined that "both parties incomes are in a state of flux such that an accurate child support calculation cannot be made at this

time." *Appellant's App. Vol. 2* at 14. The trial court then ordered that Father's child support obligation of $500 per month originally ordered in the Agreed Entry should remain in effect. *Id*. Although Father characterizes the trial order as abdicating its role as a fact finder, the trial court effectively denied Father's request to modify the existing child support order. Under Indiana Code section 31-16-8-1(b), a child support order may only be modified if: (1) there are changed circumstances so substantial and continuing as to make the terms unreasonable; or (2) a party has been ordered to pay an amount that differs by more than twenty percent from the amount that would be ordered by applying the child support guidelines. In making its determination that the parties' incomes were not certain enough to make an accurate child support determination, the trial court essentially found that it could not be determined if a substantial enough change had occurred to justify a modification in Father's child support obligation.

[45] This determination by the trial court was supported by the evidence. Mother's income was in a state of flux as of the time of the hearing. She had previously worked for the postal service and had chosen to resign from the postal service rather than return after her maternity leave. Mother testified that she decided to leave her employment with the postal service in order to pursue employment as a bus driver, which would offer a work schedule that allowed for more time with her children. *Tr. Vol. 2* at 10-11, 112-113. At the time of the hearing, Mother was in training to get her CDL license and was earning between $12 and $13 per hour while training. She was only allowed to train for two to four

hours per day, but when she obtained her CDL license and passed the training test, she would then make $21 an hour and would be considered a substitute bus driver, working four to six hours a week depending on her route. Mother would not be guaranteed to work a full week until she becomes a bus driver with a route of her own, which would take almost a year. At the time of the hearing, she was working part time in her brother's cell phone store for supplemental income. Mother worked approximately twenty hours per week, making $8 per hour. She also stated that she would be eligible for a commission check from her brother's store after about two months of employment. *Tr. Vol. 3* at 228. There were many facets of Mother's income that were uncertain at the time of the hearing that made it difficult to ascertain an income that would be accurate for any length of time.

[46]    Father's income was also in a state of flux at the time of the hearing. Father was working part time as a tutor at both Ivy Tech and Bender and Rocap and earned $13-14 per hour at Ivy Tech and $40 an hour at Bender and Rocap. Father testified that he hoped to obtain new clients with the tutoring agency because he had been there six months, and after six months, he will "move up the pecking order" where there are opportunities to get additional clients. *Tr. Vol. 3* at 192. Father testified that he was looking for additional employment that would pay more than he was presently making. *Id.* at 190. He also expected that a vacant rental property that he owned will become occupied, which would provide him with more income. *Id.* at 147. Father stated that he had applied for four or five jobs in the year since he moved back to the United

States. He had previously worked as a franchisee of a Subway restaurant in England. At the conclusion of the hearing, the trial court raised its concerns that Father was underemployed and had only applied for four or five positions. *Tr. Vol. 4* at 39. The many unknowns regarding Father's income at the time of the hearing that made it hard to determine an accurate income. We conclude that the trial court did not abuse its discretion when it found that the parties' incomes were uncertain, and it could not determine an accurate child support calculation at that time, thereby ordering the existing child support obligation to remain in effect.

## Cross-Appeal Issues

## V. Admission of Evidence

[47] Mother argues that the trial court abused its discretion when it excluded evidence of events that occurred prior to the June 26, 2014 Agreed Entry. The trial court has broad discretion to rule on the admissibility of evidence. *Curry v. State*, 90 N.E.3d 677, 683 (Ind. Ct. App. 2017), *trans. denied*. We will only reverse a trial court's decision on the admissibility of evidence upon a showing of an abuse of that discretion. *Cannon v. State*, 99 N.E.3d 274, 278 (Ind. Ct. App. 2018). An abuse of discretion may occur if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. *Id.* When evidence is erroneously excluded, reversal is only required if the error relates to a material matter or substantially affects the rights of the parties. *Hill v. State*, 51 N.E.3d 446, 450 (Ind. Ct. App. 2016). "In determining whether an error is harmless,

we 'must assess the probable impact of that evidence upon the jury.'" *Id*. (quoting *Swingley v. State,* 739 N.E.2d 132, 134 (Ind. 2000)). Where the wrongfully excluded testimony is merely cumulative of other evidence presented, its exclusion is harmless error. *Id*. (citing *Sylvester v. State,* 698 N.E.2d 1126, 1130 (Ind. 1998)).

[48] Mother asserts that the trial court abused its discretion when declined to admit evidence of events that occurred prior to the date of the Agreed Entry on June 26, 2014 that originally determined custody and parenting of Child. Mother contends that it was an abuse of discretion for the trial court to exclude the evidence because such evidence demonstrated a pattern of domestic violence by Father during the marriage that was relevant to the determination of custody and the best interest of Child. Mother maintains that this evidence was admissible even though it concerned events that occurred prior to the Agreed Entry because no custody proceeding occurred before the Agreed Entry between the parties, and, therefore, there was no opportunity for the parties to present evidence relevant to custody to a trial court.

[49] Under Indiana Code section 31-17-2-21(c), "[t]he court shall not hear evidence on a matter occurring before the last custody proceeding between the parties unless the matter relates to a change in the factors relating to the best interests of the child." In *Dwyer v. Wynkoop*, 684 N.E.2d 245 (Ind. Ct. App. 1997), *trans. denied*, this court held that this section does not apply to situations where custody was originally determined solely by stipulation of the parties because "when parents stipulate as to who will have custody of the child and the trial

court grants a summary dissolution on the basis of such agreement without hearing evidence on the issue of custody, there is no 'custody proceeding' that would activate this section of the statute." *Id*. at 249.

[50] In the present case, Mother offered evidence of events that had occurred prior to the June 26, 2014 Agreed Entry, and Father objected based upon Indiana Code section 31-17-2-21(c). Mother responded that the statute permitted the trial court to hear evidence prior to the last custody proceeding if it addressed the best interest of the child and argued that there had not been any previous "custody proceedings" because the trial court had not heard any evidence concerning custody and parenting time before this hearing. *Tr. Vol. 2* at 121-22. The trial court sustained Father's objection and ruled that any evidence prior to June 26, 2014 would be inadmissible. *Id*. at 123. During the second day of the hearing, Mother presented the trial court with *Dwyer*, asked the trial court to reconsider its ruling from the previous day, and informed the trial court that she intended to introduce evidence of domestic violence by Father dating back prior to June 26, 2014. *Id*. at 214-16. The trial court ruled that its prior ruling would stand. *Id*. at 222. Mother moved for a continuance, which the trial court denied, and at the end of the second day of the hearing, Mother again made the request that the trial court reconsider its ruling and permit evidence previous to the June 24, 2016 date at the next hearing date, which the trial court again denied. *Id*. at 223-24; *Tr. Vol. 3* at 148-51.

[51] Assuming without deciding that the trial court abused its discretion in excluding Mother's proffered evidence, we conclude that it was harmless error.

When evidence is erroneously excluded, reversal is only required if the error relates to a material matter or substantially affects the rights of the parties. *Hill*, 51 N.E.3d at 450. Mother has not shown how the excluded evidence related to a material matter or substantially affected her rights. The evidence she was attempting to have admitted at the hearing occurred during her marriage to Father, which was dissolved in October 2012. Therefore, any evidence she wished to present to the trial court occurred approximately five years prior to the custody hearing. Although the proffered evidence may have shown a pattern of domestic violence by Father prior to October 2012, Mother has not established that the pattern is continuing or how it affects a custody determination in 2017. Additionally, because Father's petition to modify custody was denied, and Mother was awarded physical custody of Child, she has not established that the trial court's exclusion of her proffered evidence has substantially affected her rights. We, therefore, conclude that even if the trial court abused its discretion in excluding Mother's proffered evidence, it was harmless error.

## VI. Attorney Fees

[52] We review a decision to award attorney fees and the amount of any award for an abuse of discretion. *Montgomery v. Montgomery*, 59 N.E.3d 343, 354 (Ind. Ct. App. 2016), *trans. denied*. An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Allen v. Proksch*, 832 N.E.2d 1080, 1102 (Ind. Ct. App. 2005). Indiana follows the American Rule, which ordinarily requires each party to pay

his or her own attorney's fees. *Id.* "Generally, attorney's fees are not recoverable from the opposing party as costs, damages, or otherwise, in the absence of an agreement between the parties, statutory authority, or [a] rule to the contrary." *Id.*

[53] Mother argues that the trial court erred in denying her request for attorney fees. She asserts that she is entitled to attorney fees under Paragraph 11 of the Agreed Entry, which stated, "In the event that either party wishes to petition the court for a modification of child support, then the party which petitions the court shall be responsible for the other party's attorney fees." *Appellant's App. Vol. 2* at 20. Mother contends that because Father's petition to modify custody also contained a request for child support to be modified, her request for attorney fees was required to be granted unless the trial court found fraud, duress, or lack of consent in the signing of the Agreed Entry.

[54] Dissolution settlement agreements may contain binding provisions regarding attorney fees, including allocation of fees in future disputes between the parties. *Stone v. Stone*, 991 N.E.2d 992, 1004 (Ind. Ct. App. 2013) (citing *Pond v. Pond*, 700 N.E.2d 1130, 1136 (Ind. 1998)). Unless a trial court finds evidence of fraud, duress, or other imperfections of consent, the court must give full force and effect to a settlement agreement's attorney fees provisions. *Id.*

[55] Here, although the Agreed Entry contained Paragraph 11, a provision requiring the allocation of attorney fees to the opposing party when the other party sought a modification of child support, this was not what occurred in the

present case. Father filed a petition for modification of custody, claiming changed circumstances such that a change of custody was in the best interests of Child. Incidental to his requested modification of custody, Father requested modifications of child support and parenting time and for all other just and proper relief because if the trial court granted his petition to modify child custody in his favor, child support and parenting time would have to likewise be modified to reflect the change in custody. We conclude that Paragraph 11 did not contemplate a requirement to pay attorney fees when a party filed a motion to modify custody, which incidentally includes a request to modify child support, as such a requirement is not explicitly stated. If such a requirement was contemplated, it could have been explicitly written into the Agreed Entry. We, therefore, find that the trial court did not abuse its discretion in denying Mother's request for attorney fees.

[56] Affirmed in part, reversed in part, and remanded with instructions.

Bradford, J., concurs.

Baker, J., concurs with separate opinion.

| | |
|---|---|
| Christopher Vicoli, | Court of Appeals Case No. |
| *Appellant/Cross-Appellee-Petitioner,* | 41A04-1711-DR-2624 |
| v. | |
| Ashley Mullica (Vicoli), | |
| *Appellee/Cross-Appellant-Respondent* | |

**Baker, Judge, concurring.**

[57] I fully concur with the majority opinion. I write separately to note that I believe the facts in the record readily support a conclusion that Father's mid-week parenting time would significantly impair Child's emotional development. Specifically, Child has ADHD and Major Depressive Disorder and gets upset when her routine is disrupted. Tr. Vol. II p. 85-86. As such, it would be eminently reasonable to conclude that a mid-week disruption would pose a risk to Child's emotional well-being. But because there are no specific factual findings to that effect in the trial court's order, I agree with the majority's resolution of this issue.